**The STATE of Ohio, Appellee,**

v.

**WILLARD, Appellant.**

[Cite as *State v. Willard* (2001), 144 Ohio App.3d 767.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–45.

Decided Aug. 16, 2001.

*Ron O'Brien,* Franklin County Prosecuting Attorney, and *Jennifer L. Coriell,* Assistant Prosecuting Attorney, for appellee.

*Yeura R. Venters,* Public Defender, and *John W. Keeling,* Assistant Public Defender, for appellant.

---

DESHLER, Judge.

This is an appeal by defendant-appellant, Leslie B. Willard, from a judgment of the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of eight counts of rape.

On September 24, 1999, defendant was indicted on eight counts of rape in violation of R.C. 2907.02, five counts of sexual battery in violation of R.C. 2907.03, and three counts of gross sexual imposition in violation of R.C. 2907.05. All the counts were alleged to have involved the same victim, and some of the rape counts alleged that the victim was less than thirteen years of age at the time of the particular offense.

The case came for trial before a jury beginning December 18, 2000. The state's first witness was the alleged victim, F.D., the daughter of defendant. F.D., who

was seventeen years of age at the time of trial, resides with her mother, Mary Ratliff. F.D. has a younger sister, two stepsisters, and one stepbrother.

At trial, F.D. testified regarding the events at issue. At age ten, when she was in the fifth grade, F.D. resided on Huy Road with her father, stepmother, and two stepsisters. Defendant molested her at that address by inserting his penis inside her vagina. At the time, F.D. "just acted like nothing happened." Defendant repeated this activity "[a]bout every three days to a week."

F.D.'s family, including her father, stepmother, and two stepsisters, later moved to 1017 East Weber Road. Defendant again engaged in similar conduct, such activity occurring "[a]bout the same amount as it did at Huy." She stated that the incidents took place "[e]ither in the garage or in his bedroom or my bedroom." The activity in the garage would take place "in the back seat of a car or something."

Approximately two years later, F.D. resided at an address on Drivemere Road with her mother, grandmother, sister, and cousins. Her father was residing at Bretton Place at the time. When F.D. would visit her father at his residence, "sometimes he would do what he did at Weber."

When F.D. was in the tenth grade, she moved to 89 Reeb Avenue and resided there with her father, stepmother, and two stepsisters. Defendant again engaged in the same sexual conduct as before. The family later moved to 53 Reeb Avenue, and defendant would "do the same thing and put his penis in my vagina." According to F.D., defendant would engage in this conduct "[m]aybe once every two to three days."

Ansel first reported defendant's activities against her in June 1999, when she was fifteen years of age. She reported the rapes because defendant "told my mom he was going to get custody of me, and I didn't want him to get custody of me." She did not say anything prior to this time because she "thought he would do something to me for telling."

During cross-examination, F.D. indicated that, when she resided at the Huy Road address, defendant sexually assaulted her in the morning before she went to school on approximately seventy-five occasions; during some of these incidents, her stepmother and/or stepsisters were also in the house. According to F.D., defendant raped her after she came home from school on approximately two hundred twenty-five occasions at the Huy Road residence. F.D. stated that, during the time she lived at the Weber Road address, defendant raped her approximately two hundred to three hundred times, such incidents occurring after school hours. She acknowledged that her stepsisters and stepmother were at home during this time. F.D. estimated that, when she lived at the Bretton Place address, defendant raped her approximately fifty to one hundred times.

When F.D. resided at 89 Reeb Avenue, her grandmother and her aunt also lived at that address. She estimated that defendant sexually assaulted her approximately fifty times at that address, and that defendant assaulted her approximately two hundred times after the family moved to the 53 Reeb Avenue residence. Regarding the number of alleged incidents at the different addresses, F.D. acknowledged to defense counsel that the total number of times she claimed defendant sexually assaulted her was approximately one thousand. F.D. also stated that the conduct on each of these occasions was the same, *i.e.,* defendant inserted his penis inside her vagina.

F.D. admitted that, in 1999, she had a disagreement with her father regarding her boyfriends. More specifically, her father did not want her to see certain individuals or conduct herself in a manner he felt was inappropriate. She further acknowledged that she wrote an autobiography for school, during portions of 1998 and 1999, in which she stated that she and her father had a great relationship. F.D. also conceded that she had spoken with a detective and that she was "not absolutely honest" in her discussions with the detective.

Mary Ratliff is the mother of F.D. Ratliff testified that she "kind of suspected" that something was wrong with her daughter. When Ratliff asked her daughter if anything was happening, "[s]he said no, but she said it in a scared way."

At the close of the state's case-in-chief, the trial court sustained defendant's motion for acquittal as to the counts charging defendant with gross sexual imposition and sexual battery. The trial court overruled defendant's motion for acquittal as to the rape counts.

The first witness for defendant was Barbara Hennis, a sister of defendant. For a period of time, Hennis lived next door to defendant and his family on Reeb Avenue, and Hennis was in defendant's house on a daily basis. Hennis testified that defendant and F.D. had a "great relationship." F.D. never indicated to Hennis that she was fearful of defendant.

Terry L. Davey is an acquaintance of both defendant and F.D. Davey testified that F.D. "always wanted to be around her dad." Further, she always said "good things" about her father.

Vanessa Willard is the wife of defendant. She testified that, for approximately one year, defendant's hand was wrapped due to a work injury occurring in 1994 or 1995, in which three of his fingers were severed.

Dr. Joseph Simone operates a family medical practice, and defendant and F.D. have been patients at his office. Dr. Simone treated F.D. for various ailments, including sinus infection, sore throat and tonsillitis. Dr. Simone testified that,

during the office visits involving F.D., he saw no evidence that would indicate sexual abuse, nor did he have any suspicion that sexual abuse was occurring.

Following deliberations, the jury returned verdicts finding defendant guilty of all eight counts of rape. Defendant was sentenced by judgment entry filed December 28, 2000. The trial court imposed life sentences on three of the counts, while imposing sentences of ten years each on the remaining counts.

On appeal, defendant sets forth the following four assignments of error for review:

*"Assignment of error number one:*

"The trial court erred when it entered judgment against the defendant when the evidence was insufficient to sustain the conviction and the conviction was against the manifest weight of the evidence presented.

*"Assignment of error number two:*

"The prosecutor engaged in misconduct when he stated, without any evidentiary basis during closing argument, that individuals, such as social workers and detectives who are trained to investigate sexual abuse cases, believed that the complainant was telling the truth. The prosecutor engaged in further misconduct when he pointed to the defendant and told the jury that this was what a man who rapes his daughter looks. like and by belittling the defendant because he allowed his attorney to cross-examine his own daughter. Further error occurred when the prosecutor misstated the evidence during argument. This violated the defendant's constitutional rights to confront and cross-examine witnesses and his constitutional rights to due process and a fair trial.

*"Assignment of error number three:*

"The trial court erred when it prohibited the defendant from cross-examining the state's only material witness on the reasons or motivations the witness had for falsely accusing the defendant. This violated the defendant's constitutional rights to confront and cross-examine the witnesses against him and his constitutional rights to due process, a fair trial and to present favorable evidence on his behalf.

*"Assignment of error number four:*

"The trial court committed plain error when it failed to submit verdict forms that would have allowed the jury to properly consider the lesser offense of rape without the life sentence."

We will initially address defendant's second assignment of error, in which defendant asserts that the prosecutor engaged in prosecutorial misconduct.

In *State v. Bruce* (Sept. 25, 1997), Cuyahoga App. No. 70982, unreported, 1997 WL 599379, the court noted the applicable standard of review for prosecutorial misconduct:

"Generally, conduct of a prosecuting attorney at trial shall not be grounds for reversal unless the conduct deprives the defendant of a fair trial. * * * An appellant is entitled to a new trial only when a prosecutor asks improper questions or makes improper remarks and those questions or remarks substantially prejudiced appellant. * * * In analyzing whether an appellant was deprived of a fair trial, an appellate court must determine whether, absent the improper questions or remarks, the jury would have found the appellant guilty. * * * The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. * * * In addition, should a defendant fail to object to the prosecutor's allegedly improper comments at trial pursuant to Crim.R. 52(B), the comments in question must rise to the level of plain error affecting the substantial rights of the defendant before this court can take notice of the error. Under a plain error analysis, reversal of a conviction is appropriate only if it can be said that, but for the alleged error, the result of the trial would clearly have been different. * * *"

Defendant contends that he was denied a fair trial due to four instances of prosecutorial misconduct during the state's closing argument. First, defendant argues that the prosecutor referred to facts not in evidence and inferred to jurors that trained social workers and detectives believed the alleged victim's accusations. Specifically, defendant cites the following colloquy during the state's closing argument:

"[PROSECUTOR]: Defense also wants you to believe that [F.D.'s] not only a liar, but a really good one. She's sophisticated enough to pull off a lie, is able to fool individuals who are trained to investigate these type of things, social workers, detectives.

"[DEFENSE COUNSEL]: Objection, Your Honor. There's been no testimony from social workers, and we're arguing facts that are not in evidence.

"THE COURT: Sustained."

Second, defendant argues that the prosecutor improperly commented on defendant's physical appearance when he pointed to defendant and told the jury that, "as we stand here right now, this is what a man who rapes his daughter looks like. This man is guilty."

Defendant next contends that the prosecutor improperly attempted to play to the emotions of the jury when he indicated that defendant's counsel had embarrassed and belittled the alleged victim during cross-examination. Specifically, during closing arguments the prosecutor stated that F.D. "had to come in and

explain to a courtroom full of strangers the most degrading, dehumanizing acts that a person could suffer." The prosecutor further stated:

"So [F.D.] sits here, and we're talking five feet, six feet, from the man who raped her. And she tries to shy away, she tries to hide her face with her hair, anything that she can do to get away from that. She goes through all this, and then she has to sit and undergo and endure cross-examination at the hands of her assailant's attorney. Does anybody think that this has been fun?"

Finally, defendant asserts that the prosecutor misstated the evidence during closing argument. Defendant's argument concerns the prosecutor's reference to the testimony of Dr. Simone. Defendant notes that, during cross-examination, Simone stated that during his seven years of practice he had seen three or four children who had been sexually abused. The prosecutor then asked the physician, "of those three or four children, how many disclosed to you initially that they were being sexually abused?" Simone responded, "none," and the prosecutor asked no further questions. Later, during closing arguments, the prosecutor stated:

"Dr. Simone said he'd seen three or four other patients who had been sexually abused. He didn't recognize it because they didn't report it to him. So how much weight are we going to give to his testimony."

Defendant argues that the physician never testified that he failed to recognize signs of abuse in those cases, but, rather, he merely stated that, in those instances, none of the children had initially disclosed to him that they were being sexually abused. Defendant contends that the prosecutor portrayed the doctor as a professional who failed to recognize signs of child abuse in his patients and as a physician who could not recognize such signs unless the abuse was directly reported to him.

 As noted above, the prosecutor's statement that the complainant was "sophisticated enough to pull off a lie" and to "fool" social workers and detectives "trained to investigate these types of things" prompted an objection by defendant's counsel. Defense counsel noted at the time that there had been no testimony from social workers at trial, and the trial court sustained the objection. We agree with defendant's contention that the prosecutor's comment was improper, as the effect of the statement was to bolster the complainant's version by suggesting that social workers and detectives, trained to investigate cases of abuse, believed the witness. No such testimony was presented, nor would it be proper for such a witness to render an opinion whether a victim was being truthful as to claims of sexual abuse. See, *e.g.*, *State v. Miller* (Feb. 10, 1995), Wood App. No. WD–94–47, unreported, 1995 WL 54083 ("[w]itnesses, generally,

may not comment on the veracity or credibility of another witness, including a victim").

While a prosecutor has wide latitude in summation, this latitude "does not 'encompass inviting the jury to reach its decision on matters outside the evidence adduced at trial.'" *State v. Freeman* (2000), 138 Ohio App.3d 408, 419, 741 N.E.2d 566, 573. See, also, *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885 ("[i]t is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury"). Although the trial court properly sustained the objection to this comment, defendant contends that merely sustaining the objection did not cure the prejudice resulting from the prosecutor's inference that social workers and law enforcement officers found the complainant's story believable. While we find that the statement was improper, prosecutorial misconduct is not reversible unless it was so prejudicial as to deny the defendant a fair trial. We will consider, *infra*, whether this statement or other statements substantially prejudiced defendant.

The prosecutor's comment to the jurors that "this is what a man who rapes his daughter looks like" was also an improper statement. Although not clear from the record, the prosecutor's statement may have been an attempt to appeal to the jurors' sense of outrage, as citizens of the community, toward those who commit sexual crimes against children. The prosecutor compounded this error by following the above statement with the comment that "[t]his man is guilty." A guilty verdict, however, must rest, not upon what a defendant does or does not look like, but rather upon the evidence properly adduced at trial. Because defendant's appearance was irrelevant to the issue of guilt or innocence, the inference that his appearance was probative of guilt introduced the potential dangers of prejudice, confusion, and irrelevant factors to the jury's deliberations.

We also find improper the prosecutor's statement that the complainant was required to "sit and undergo and endure cross-examination at the hands of her assailant's attorney." The prosecutor's remarks implicated defendant's right to cross-examination and denigrated defendant's counsel for exercising the right to confront the state's primary witness, while potentially arousing the sympathies of the jurors for the complainant. The danger of such a "sarcastic statement" by the prosecutor is that it invites the jury to "punish [defendant] for making the victim of the crime go through the ordeal of cross-examination, which [defendant] had every right to do." *Burns v. Gammon* (C.A.8, 1999), 173 F.3d 1089, 1095. Further, a prosecutor "may not * * * denigrate the role of defense counsel by injecting his personal frustration with defense tactics." *State v. Hart* (1994), 94 Ohio App.3d 665, 674, 641 N.E.2d 755, 761.

■ The record also supports defendant's contention that the prosecutor misstated Simone's testimony. As previously noted, during cross-examination, the prosecutor briefly inquired of Simone as to whether he had treated any sexually abused children. Simone indicated that he had treated three or four children who had been sexually abused. The prosecutor then asked the physician how many of those children had "disclosed to you initially that they were being sexually abused," and Dr. Simone responded, "none." However, during closing argument, the prosecutor stated that Simone "didn't recognize it [sexual abuse] because they didn't report it to him." As noted by defendant, the physician never testified that he failed to recognize or observe signs of abuse in those patients; rather, he merely stated that none of those children had initially disclosed to him that they were being sexually abused. In fact, Simone testified during direct examination regarding conduct he would consider indicative of "a sexual abuse situation," and he stated that he observed no such conduct between defendant and F.D. Whether deliberate or inadvertent, we find the prosecutor mischaracterized the testimony of defendant's witness, and thus the comment at issue was improper.

■ Even though we find the above comments by the prosecutor to have been improper, we must still determine whether such remarks were so prejudicial as to deny defendant a fair trial. *Freeman, supra,* at 419, 741 N.E.2d at 573. Further, the improper conduct must be assessed in the context of the entire case, and a reviewing court "must also consider the cumulative effect of improper comments, because '[e]rrors that are separately harmless may, when considered together, violate a person's right to a fair trial.'" *Id.* at 420, 741 N.E.2d at 574.

■ Although, when viewed alone, any single remark may not be enough to require reversal, we conclude that the cumulative effect of the prosecutor's improper statements in the present case denied defendant a fair trial. Here, the evidence of defendant's guilt was not overwhelming. Specifically, there was no corroborating physical evidence as to F.D.'s claim of sexual abuse and, despite the fact that approximately one thousand alleged incidents took place over a time period in which other family members were living in the same household, there were no other witnesses who corroborated the victim's story. Thus, the determinative issue for the trier of fact was the truthfulness and credibility of F.D., and the prosecutor's improper comments touched on credibility issues.

As noted, the prosecutor's remark about social workers and detectives, trained to investigate abuse, suggested that there were facts beyond those presented to the jury indicating that these individuals believed the complainant and found her story credible. The misstatement regarding the physician's testimony cast doubts on the credibility of one of the defendant's witnesses. The prosecutor also denigrated defense counsel and appealed to the jury's emotions regarding defen-

dant's decision to exercise the right to cross-examine the complainant. Finally, the prosecutor's comment that "this is what a man who rapes his daughter looks like" invited the jury to consider irrelevant issues in its deliberations. We are cognizant of the fact that prosecutors must be "zealous advocates and enforcers of the law," and that they face the difficult task of walking a fine line between "vigorous advocacy and the denial of a fair trial." *United States v. Francis* (C.A.6 1999), 170 F.3d 546, 552–553. However, in the instant case, the prosecutor failed to "refrain from improper methods." *Id.* at 553. While defense counsel did not object to all of the remarks, we find that, in the context of the entire case, and taking into consideration the cumulative effect of the erroneous comments, reversal for a new trial is required even under a plain-error analysis as the error affected the substantial rights of defendant. A hallmark of our system of criminal jurisprudence is that even those charged with despicable crimes are entitled to a fair trial. If we retreat from this proposition, we denigrate the fundamental proposition that our system is one of laws. And, while the prosecutor is permitted, even expected, to zealously seek conviction of those accused, there are limits applicable to prosecutorial trial practice. In this case, the record reveals that the prosecution, in an effort to secure an edge, crossed the line and the result is that defendant was deprived of a fair trial. Under such circumstances, reversal for a new trial is mandated.

Based upon the foregoing, defendant's second assignment of error is sustained.

In light of our disposition of the second assignment of error, requiring a remand for a new trial, we do not reach the issues raised under defendant's third and fourth assignments of error, nor do we address defendant's manifest weight argument under his first assignment of error, as these issues are rendered moot. However, we will address defendant's sufficiency of the evidence claim that is part of his first assignment of error because, "if we sustain that claim, the state will be barred from retrying [defendant]." *Freeman, supra,* at 424, 741 N.E.2d at 576.

Under his first assignment of error, defendant asserts that his conviction was not supported by sufficient evidence. Defendant argues that the facts of this case are unusual based on the staggering number of alleged incidents (between 900 and 1,100) over a five-year period of time and the lack of any corroborating evidence to support the complainant's testimony.

In order to reverse a conviction for insufficient evidence, an appellate court must, after reviewing the evidence in a light most favorable to the state, determine that a rational trier of fact could not have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Millow* (June 15, 2001), Hamilton App. No. C–000524, unreported, 2001 WL 693918. Further, in performing this review, "the appellate court may neither resolve evidentiary conflicts

in the defendant's favor nor substitute its assessment of the credibility of the witnesses for that of the trier of fact." *Id.*

R.C. 2907.02(A) sets forth the elements of rape, and states in pertinent part:

"(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

"* * *

"(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

"* * *

"(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

The term "sexual conduct" is defined under R.C. 2907.01(A) as follows:

" 'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

In the present case, F.D. testified that defendant inserted his penis inside her vagina, beginning when she was ten years old, and that such conduct continued until she was fifteen years old. She also testified as to the frequency of defendant's conduct over the time period. As noted above, in reviewing the sufficiency of the evidence, we construe the evidence most strongly in favor of the state and do not substitute our assessment of credibility of witnesses for that of the jury. Here, the testimony of F.D., if believed, was sufficient to support the rape convictions and, thus, that portion of defendant's first assignment of error challenging the sufficiency of the evidence is overruled.

Based upon the foregoing, defendant's second assignment of error is sustained, defendant's first assignment of error is overruled in part and rendered moot in part, and defendant's third and fourth assignments of error are rendered moot. Accordingly, the judgment of the Franklin County Court of Common Pleas is reversed and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

BOWMAN and LAZARUS, JJ., concur.