OPINION.
{¶ 1} Defendant-appellant Jonathan Tobias was indicted for twelve counts of gross abuse of a corpse in violation of R.C. 2927.01(B), twelve counts of abuse of a corpse in violation of R.C. 2927.01(A), and one count of breaking and entering in violation of R.C. 2911.13. The charges of abuse of a corpse in violation of R.C. 2927.01(A) and breaking and entering were later dismissed. Following a jury trial that included co-defendant Thomas Condon, Tobias was acquitted on ten counts of gross abuse of a corpse in violation of R.C. 2927.01(B) and found guilty of the remaining two counts of gross abuse of a corpse. Specifically, he was found guilty of abusing the corpses of Adam Richardson in count ten and Christina Folchi in count twelve.
 {¶ 2} On April 14, 2002, Tobias was sentenced to one year of community control on each count, to be served concurrently. As a condition of community control, Tobias was confined for five months on each count, to be served concurrently, and ordered to perform 250 hours of community service helping the elderly and to pay court costs. Tobias filed a motion for a stay of execution, which was denied by the trial court and then granted by this court. Tobias now appeals.
 {¶ 3} In July 2000, Tobias became a fellow at the Hamilton County Coroner's office, working as a junior pathologist. In January 2001, Tobias was suspended without pay for his alleged involvement with co-defendant Thomas Condon, a photographer. The events leading up to this case were as follows.
 {¶ 4} In 1999, Ernest Waits, owner of Universal Media Consultants, approached Terry Daly, administrative assistant for the Hamilton County Coroner's office. According to Daly, Waits was interested in making a video project explaining death to children, and he wanted to use the morgue to take photographs. Daly explained that he could not allow Waits to do his project, but asked him to make an autopsy video for the coroner's office to be used for educational purposes. Waits agreed to meet with Daly.
 {¶ 5} In March 1999, Dr. Carl Parrott, chief deputy coroner for Hamilton County, Daly, Waits, Condon, Ronda Lindemann, the office administrator for the Hamilton County Coroner's office, and possibly Dr. Robert Pfalzgraf, chief deputy coroner of pathology, met to discuss making the autopsy training video. It is uncontested that Tobias was not present at the meeting. Parrott had been interested in revising a death-investigation seminar presented by the coroner's office and wanted to update the autopsy film. At the conclusion of the meeting, Parrott stated that he would contact the prosecutor's office for an opinion regarding the legal ramifications of videotaping corpses, particularly whether consent was needed.
 {¶ 6} In July 2000, a second meeting was conducted to discuss the cost of making the autopsy training video. Parrott, Daly, Waits, Condon, Pfalzgraf, and possibly Lindemann attended the second meeting. It is uncontested that Tobias was not at the second meeting. In order to receive an accurate price quote, Parrott gave Waits and Condon permission to view the morgue to determine what resources they would need to make the autopsy training video. According to Parrott, Waits and Condon were expected to determine how many videographers and cameras would be needed, as well as to consider camera placement and sound quality. Parrott testified that he only allowed Condon limited access to the morgue. Condon had authority to view one autopsy and to take limited photographs of the autopsy for the sole purpose of assessing the cost of the autopsy training video. Parrott testified that Condon was not given permission to take photographs for his personal use.
 {¶ 7} After the second meeting, supervision of the project was delegated to Pfalzgraf and Daly. Daly set up a time for Waits and Condon to view the morgue. It is uncontested that Condon visited the morgue on at least two occasions in August 2000, and Daly testified that he gave Condon access to the morgue both times. For the first visit, Waits and Condon merely assessed the morgue. On the second visit, Condon viewed an autopsy of John Brady, which was performed by Pfalzgraf, to determine lighting and camera angles. Tobias was first introduced to Condon on August 16, while working at the morgue.
 {¶ 8} Pfalzgraf testified that he informed the staff that Condon had permission to be in the morgue on August 16, but that the limits of Condon's research were not discussed with the staff. Daly testified that he never discussed the limits of Condon's activities with Pfalzgraf. And Lindemann testified that she never informed the staff that Condon was not to take still photographs or videos at the morgue.
 {¶ 9} After the visits, Waits submitted an estimate to Parrott of $10,000 for producing the autopsy-training video project. Parrott and Lindemann discussed the estimate and agreed that the office did not have sufficient money in its budget for the project. According to Parrott, the project was thereafter postponed.
 {¶ 10} In September 2000, Daly informed Waits that the autopsy-training video project had been cancelled. And in October, Daly similarly informed Condon. Daly stated that while Condon expressed an interest in completing his own personal project, Condon did not, to his knowledge, ask permission to continue with his project.
 {¶ 11} Pfalzgraf testified that he saw Condon at the morgue at least one or two times after the Brady autopsy and was told that Condon was there to teach Dr. Gary Utz, a senior pathologist at the Hamilton County Coroner's office, and Tobias how to better use a camera. Daly and Parrott, however, testified that they were unaware that Condon continued to visit the morgue. And Parrott testified that Condon no longer had permission to be in the morgue after the autopsy-training video project had been cancelled.
 {¶ 12} On January 7, 2001, Tyrone Smith and Clyde Gamble, both morgue attendants, saw Condon come into the morgue in the afternoon. According to Smith, he, Gamble, and Tobias were alone in the morgue when Condon came in with his camera equipment. According to Gamble, Condon talked with Tobias about the smell coming from an autopsy Tobias was performing and then entered a cooler where cadavers were stored in body bags. Gamble observed Condon bring in lighting equipment. Smith and Gamble testified that Condon spent one to one and a half hours in the cooler. Gamble testified that Condon came out of the cooler a number of times to get paper towels. At some point, Smith entered the cooler to get a body for a funeral home, and he saw Condon standing by Christina Folchi's body with lights around her body. Smith testified that Condon appeared to be taking pictures of Folchi, and that her body was completely exposed. Photographs subsequently obtained by the police showed Folchi's body with a tube in her incision, cloth over her eyes, a book by her side, a key in her mouth, and a snail shell, a "will" card, and sheet music on her body. Smith and Gamble testified that Condon and Tobias left the autopsy room together.
 {¶ 13} On January 8, 2001, Brent Erke was working at Robin Imaging Photography Lab ("Robin Imaging") when he noticed some "questionable" black and white film being reproduced into a negative format. Erke testified that he was responsible for ensuring that all of the processing machines were within quality control and that the film was processed correctly. Erke was shocked and mortified by the negatives and notified his employer, William Johnson. Johnson examined the negatives. After determining that he had never encountered anything like them in his thirty years in business, Johnson called the police. Johnson stated that the photographs were unique because they depicted corpses posed with inanimate objects. Johnson confirmed that the film had been brought in by Condon to be developed into negatives. At the request of the police, Johnson made a copy of the negatives for the police and returned the original set of negatives to Condon by placing them in his locker. Johnson testified that, in his thirty years, he had only seen images that he would have considered questionable one or two times.
 {¶ 14} The police obtained a search warrant and searched Condon's studio. There they found hundreds of negatives and developed prints of corpses, many of them depicting a corpse with a prop placed next to the body. The police were able to identify the corpses. Of relevance here, they identified the bodies of Adam Richardson and Christina Folchi.
 {¶ 15} Officer Sharon Dillman testified that during the course of her investigation she discovered that Tobias had been working at the morgue during the times when Condon was believed to have taken the photographs of, among others not relevant here, Richardson and Folchi.
 {¶ 16} Lindemann testified that, based on her examination of the coroner's files, Tobias had performed the autopsy of Adam Richardson on December 24, 2000, and that Utz had signed off on the autopsy. And Lindemann testified that Tobias was at the morgue performing another autopsy when Christina Folchi's body was at the morgue. (Utz performed that autopsy of Folchi.) Lindemann also identified Tobias as the coroner in several of the photographs of Adam Richardson.
 {¶ 17} Officer Mary Turner testified that she observed Condon and Tobias shopping together three or four times in October or November 2000 at a local grocery store.
 {¶ 18} Parrott testified that, as the chief deputy coroner, he was responsible for the operation of the Hamilton County Coroner's office. The second coroner in command was Pfalzgraf. The senior pathologists at the office were Pfalzgraf, Utz, and Dr. Dan Schultz. All senior pathologists were board-certified pathologists and full-time pathologists. Parrott testified that a junior pathologist was often employed at the morgue. Parrott explained that the junior pathologist was a fellow who was not a board-certified pathologist. He stated that, typically, junior pathologists were fellows employed on a part-time basis. He explained that the fellow usually worked in conjunction with the University of Cincinnati. The junior pathologist reported directly to the senior pathologist and did not have the authority to sign off on an autopsy by himself. According to Parrott, a fellow was supposed to be closely supervised and trained by the senior pathologist.
 {¶ 19} Pfalzgraf testified that a senior pathologist had to be present when the junior pathologist performed an autopsy. Pfalzgraf explained that fellows had medical degrees and some residency training, but sought fellowships with pathologists to specialize in forensic pathology. Pfalzgraf identified Tobias as one of the two fellows working at the coroner's office.
 {¶ 20} Parrott testified that when a body was transported to the coroner's office, a pathologist performed an autopsy, and the body was kept in a cooler until it was picked up, usually by a funeral home. Parrott testified that the pathologist and morgue attendants typically had access to the bodies, but that criminalists, police, prosecutors, physicians, and medical students sometimes observed the autopsies. During an autopsy, the body was photographed and examined externally. Parrott testified that photographs were taken for both medical and legal reasons, including establishing the identity of a body. Parrott and Lindemann testified that, at times, the pathologists had to go to a crime scene and photograph a body before taking it to the morgue.
 {¶ 21} According to Parrott, all photographs were taken with a digital camera, stored on CD, and kept in the coroner's office. Lindemann testified that prints of the photographs were often kept in a file jacket that was maintained for each cadaver. Pfalzgraf testified that he maintained a personal collection of photographs for teaching purposes, and that he had never asked permission to take the photographs.
 {¶ 22} Dr. Cecilia Fenoglio-Preiser, chairman and director of the department of pathology and laboratory medicine at the University of Cincinnati, testified on behalf of Tobias. She testified that Tobias was accepted as a resident at the University of Cincinnati in 1999. Fenoglio-Preiser interacted with Tobias on a daily basis when he worked at the university because she was responsible for the quality of his training. In her opinion, "Dr. Tobias is extremely and highly regarded by our own faculty and by the people who have interacted with him. His degree of professionalism has been one of the highest that we have seen and I have been teaching residents since 1973."
 {¶ 23} Dr. Michael Balko, a pathologist at the University of Cincinnati Department of Pathology, also testified. He stated that he had known Tobias for two years and considered him to be intelligent, appropriate, and respectful.
 {¶ 24} We first address Tobias's second assignment of error, which concerns whether the trial court erred when denying his Crim.R. 29 motion for a judgment of acquittal. For the following reasons, we sustain this assignment.
 {¶ 25} A judgment of acquittal must be entered for a defendant if the evidence is insufficient as a matter of law because the prosecution's case-in-chief has not been proved as a matter of law.[1] When reviewing the sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the prosecution and determine whether such evidence could have convinced a rational trier of fact that the essential elements of the crime were proven beyond a reasonable doubt.[2] In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of the witnesses, as both are functions reserved for the trier of fact.[3]
 {¶ 26} Tobias was convicted of two counts of aiding and abetting the gross abuse of a corpse in violation of R.C. 2927.01(B). Neither the criminal complaint nor the final judgment in this case makes any reference to "complicity" under R.C. 2923.03. But this causes no procedural impediment because R.C. 2923.03(F) provides that a charge of complicity may be stated in terms of that statute or in terms of the principal offense. Thus, Tobias could have been convicted of complicity to an offense even though the charging instrument stated only the principal offense and did not mention complicity.[4]
 {¶ 27} As an accomplice, Tobias could be held criminally liable as if he were the principal offender and was criminally culpable to the same degree as the principal offender.[5] R.C. 2927.01(B) provides that "[n]o person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community standards." The comment to R.C. 2927.01 states that the legislature intended for the statute to cover "conduct formerly prohibited by specific prohibitions against grave robbing and unlawful dissection of a corpse. It also includes other kinds of conduct, such as copulation with or otherwise mistreating a corpse. This section does not include conduct authorized by law, such as mandatory autopsy or the examination of a dead body on court order." The culpable mental state required for a violation of R.C. 2927.01(B) is recklessness.[6]
 {¶ 28} A person aids and abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime, and shares the criminal intent of the principal.[7] Mere association with the principal offender or presence at the scene is not enough; rather, the state must establish that the offender "took some affirmative action to assist, encourage, or participate in the crime by some act, deed, word, or gesture."[8]
"`Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'"[9]
Thus, to prove complicity here, the state had to present sufficient evidence of (1) an act by Tobias contributing to the gross abuse of the corpses of Folchi and Richardson, and (2) an intent to aid in the gross abuse.
 {¶ 29} The state's theory in this case, which was seemingly adopted by the jury, was that Tobias knew that Condon was taking photographs without permission for personal use in violation of R.C.2927.01(B) and that Tobias either aided Condon's actions or acquiesced to the activity in violation of Tobias's duty to report the misconduct to his superiors. Given the evidence presented at trial, we cannot agree that it was sufficient to establish an affirmative act by Tobias contributing to the gross abuse of a corpse.
 {¶ 30} Regarding complicity to the gross abuse of the corpse of Folchi in count twelve, the evidence showed that Tobias was in the morgue at the same time Condon was believed to be taking pictures of Folchi in the cooler. Gamble testified that Condon spoke with Tobias about the smell coming from an autopsy Tobias was performing. And Gamble and Smith testified that Condon and Tobias walked out of the morgue together. Even when viewing this evidence in the light most favorable to the state, we are not persuaded that it was sufficient to prove that Tobias took an affirmative action in aiding Condon. The testimony of Smith and Gamble was insufficient to demonstrate such an affirmative act.
 {¶ 31} Regarding complicity to the gross abuse of the corpse of Richardson in count ten, the only evidence connecting Tobias with Richardson was that Tobias performed the autopsy of Richardson on December 24, 2000, and that Tobias appeared in a few of the photographs of Richardson. The state suggests that the photographs of Tobias performing the autopsy were identical in style and nature to the prop photographs taken by Condon, and that this similarity reflected Tobias's knowledge of the photographs. Again, even when viewed in the light most favorable to the state, this was not enough to demonstrate an affirmative act. While this evidence may have been sufficient to establish criminal intent, it was simply not sufficient to establish an affirmative act by Tobias.
 {¶ 32} Moreover, there was no evidence that Tobias aided Condon before the crimes were committed. While the testimony sufficiently established that Tobias was present at the morgue every time Condon was believed to be there taking photographs, there again was no evidence that Tobias took an affirmative action to aid Condon. Rather, the most that can be said from the testimony is that Condon and Tobias were friendly with one another, as they were seen together at a neighborhood grocery store and having lunch together, and that Tobias was present at the time the offenses against Folchi and Richardson were believed to have occurred. The inferential value of this testimony was not enough to establish an affirmative act.
 {¶ 33} In sum, we hold that the evidence presented at trial was not sufficient to establish that Tobias aided and abetted Condon in committing gross abuse of a corpse as alleged in counts ten and twelve. Because we hold that the convictions were not supported by sufficient evidence, we decline to address Tobias's argument that his convictions were against the manifest weight of the evidence. Accordingly, we sustain that part of the second assignment of error relating to the sufficiency of the evidence.
 {¶ 34} Given our resolution of the second assignment of error, we find the following assignments of error to be moot: (1) the first assignment, which asserts that the trial court erred in refusing to dismiss the indictment; (2) the third assignment of error, which alleges that the trial court should have granted a new trial based on prosecutorial misconduct; (3) the fourth assignment of error, which asserts that the trial court erred in instructing the jury; (4) the fifth assignment of error, which asserts that the trial court erred by failing to compel disclosure of exculpatory evidence; (5) the sixth assignment of error, which alleges that it was error for the trial court to permit the families of the victims to testify and to admit certain photographs; (6) the seventh assignment of error, which asserts that the trial court erred in denying Tobias's motion for relief from prejudicial joinder; (7) the eighth assignment, which asserts that the trial court erred in failing to dismiss the charges prior to trial; (8) the ninth assignment of error, which alleges that the cumulative effect of errors deprived Tobias of a fair trial; and (9) the tenth assignment of error, which alleges that Tobias's sentence was contrary to law.
 {¶ 35} Accordingly, the judgment of the trial court is reversed, and we discharge Tobias from further prosecution.
Judgment reversed and appellant discharged.
Gorman, J., concurs.
Painter, P.J., concurs in judgment only.
[1] See State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 54.
[2] See id. at 386; State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in State v. Smith,80 Ohio St.3d 89, 1997-Ohio-335, 684 N.E.2d 668.
[3] See State v. Willard (2001), 144 Ohio App.3d 767, 777-778,761 N.E.2d 688.
[4] See State v. Herring, 94 Ohio St.3d 246, 251, 2002-Ohio-796,762 N.E.2d 940.
[5] See State v. Moore (1985), 16 Ohio St.3d 30, 32-33,476 N.E.2d 355.
[6] See State v. Glover (1984), 17 Ohio App.3d 256, 257,479 N.E.2d 901.
[7] See State v. Johnson, 93 Ohio St.3d 240, 245-246, 2001-Ohio-1336,754 N.E.2d 796.
[8] State v. Mootispaw (1996), 110 Ohio App.3d 566, 570,674 N.E.2d 1222.
[9] State v. Johnson, supra, at 245, quoting State v. Pruett (1971),28 Ohio App.2d 29, 34, 273 N.E.2d 884.
 Painter, P.J., concurring in judgment only.
 {¶ 36} I concur in the reversal and discharge. Tobias was proved guilty of nothing. I write separately only to point out that although t he issue is now moot at the appellate level because of the discharge, it was error for the trial court to refuse to sever this case from the one against Condon.
 {¶ 37} This is a textbook case of prejudicial joinder — how much more prejudicial can it be than to be wrongly convicted of a crime ? If the cases had been severed, all the evidence against Condon alone would have been irrelevant in Tobias's separate trial. Tobias was convicted by spillover. It was a clear abuse of discretion to fail to sever the trials.
 {¶ 38} There were myriad other errors in jury instructions, in statements by the prosecutor, and in the admission of evidence. I agree with my coll eagues that these errors are now moot at the appellate level. But without them, the case might not have reached the appellate level.