OPINION
{¶ 1} This is an appeal by defendant-appellant, George L. Lane, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which appellant was found guilty of aggravated murder with specifications and tampering with evidence. Appellant was also found guilty by the court of having a weapon under disability.
 {¶ 2} On March 15, 2002, appellant was indicted on one count of aggravated murder with specifications, one count of tampering with evidence, and one count of having a weapon while under disability. The indictment arose out of an incident in which appellant fatally shot Shanga Lane at an apartment located at 2819 Grosse Point Road in Franklin County, Ohio.
 {¶ 3} The matter came on for trial beginning May 13, 2003. The count alleging aggravated murder with specifications and the count alleging tampering with evidence were tried to a jury. The count alleging having a weapon under disability was tried to the court.
 {¶ 4} At trial, the state presented evidence showing the following facts: Sheyoshi Lane is appellant's cousin. On Tuesday, March 5, 2002, sometime between 12 and 2 p.m., Sheyoshi drove her brother, Shanga, and her son, Gavin, to an apartment where her cousin, Jontyia Wilder (Tyia) resided. Tyia was throwing a birthday party for her daughter, Ebony Wilder, that evening.
 {¶ 5} Appellant, who was Shanga's cousin, was staying at Tyia's apartment. Shanga wanted to be dropped off early at Tyia's so that he could visit with appellant before the party began.
 {¶ 6} Sheyoshi returned to Tyia's apartment later that evening to pick up Shanga and her son. When Sheyoshi arrived at Tyia's apartment, the party was going on. Sheyoshi observed that appellant was bleeding from his lip and that he was angry. Sheyoshi saw appellant leave the apartment through the sliding back door that exits from the kitchen to a patio. A couple of minutes later, Sheyoshi saw appellant re-enter the apartment through the same door.
 {¶ 7} Jonathan Wilder is Ebony's older brother. Shanicqua Wilder is Jonathan's girlfriend. Sheyoshi, Shanga, Jonathan, and Shanicqua were all in the kitchen when appellant re-entered. Appellant was still angry and yelled: "One of you mother fuckers is going to pay." (Tr. 70.) Appellant then went upstairs. Sheyoshi, Shanga, and Gavin began walking toward the front door to leave. Because there was some talking and laughing still going on, Sheyoshi decided to sit on the bottom steps of the stairway leading to the upstairs. The steps where Sheyoshi sat were located to the immediate left of the front door of the apartment. As Sheyoshi was sitting on the bottom steps, she observed appellant run down the stairway holding a gun. While standing on the stairway, appellant pointed the gun over the stairway rail at Shanga and fired the gun several times. Appellant then ran out the front door followed by his girlfriend.
 {¶ 8} Sheyoshi testified that about five to ten minutes elapsed between the time appellant went upstairs until the time he shot Shanga. Prior to the shooting, Sheyoshi heard appellant say, "Fuck that," and "You all not going to be playing with me like that." (Tr. 85.)
 {¶ 9} After appellant ran out the front door, Sheyoshi called 911 on her cell phone. Sheyoshi heard Tyia say, "Shanga's dead, Shanga's dead." (Tr. 86.) Sheyoshi touched Shanga as he lay on the kitchen floor. Sheyoshi became upset and started throwing bottles around the apartment and "tearing the house up." (Tr. 88.)
 {¶ 10} Tyia Wilder testified that on March 4, 2002, appellant and his girlfriend, Latrina Morgan, stayed over at Tyia's apartment. Tyia let appellant and his girlfriend sleep upstairs in her children's room since they were not home that night. Appellant kept his belongings in the upstairs bedroom. Tyia was aware that appellant kept a gun amongst his belongings. In the early hours of March 5, 2002, Tyia's ex-boyfriend, Anthony Palmer, unexpectedly showed up at Tyia's apartment yelling and banging at the door. Tyia called the police. The police came and took a report. Appellant was there at Tyia's apartment when this incident regarding Anthony occurred. Tyia had had similar problems with Anthony before and had called the police. Tyia testified that she did not ask appellant to come to her aid in any way and that she felt that calling the police was the best way to handle Anthony. Tyia testified on cross-examination that appellant did not give her his gun during this incident with Anthony.
 {¶ 11} Tyia testified that on the evening of March 5, 2002, she left the party at her apartment to go to the "drive-through." When she returned to the party, appellant's lip was bleeding and "Shanga was trying to apologize." (Tr. 120.) Appellant went out through the rear door to the patio and Tyia followed to try to calm appellant down. According to Tyia, while appellant was on the patio, appellant stated: "Somebody is going to die," and "Somebody is going to pay for this," and "somebody is going to pay for this hospital bill." (Tr. 122.)
 {¶ 12} Tyia was outside on the patio with appellant for about two or three minutes. She then went back inside to go upstairs to her bathroom. While Tyia was going upstairs, she saw appellant re-entering through the back door into the kitchen area. Appellant then came upstairs while Tyia was in the upstairs bathroom. Appellant entered the bathroom to look at his lip. Tyia tried to calm appellant down while appellant was saying: "Somebody is going to have to pay for this." (Tr. 124.)
 {¶ 13} While Tyia remained upstairs, appellant then went downstairs. Tyia heard appellant say, "MFing body want to step outside?" Id. She also heard appellant say he is going to "blow their head off," and then she heard gunshots. Id.
 {¶ 14} Ebony Wilder was 18 years old on the date that appellant shot Shanga Lane. Ebony arrived at Tyia's apartment for her birthday party around 6 p.m. Ebony observed appellant and Shanga engaging in play-boxing in the living room and then in the kitchen. Appellant and Shanga were not angry during the play-boxing. During the play-boxing, Shanga hit appellant on the lip, and then appellant became angry. Ebony heard appellant say: "Someone is going to pay for my doctor bill. As soon as he steps out this door, I am going to shoot him in the head." (Tr. 177.)
 {¶ 15} Ebony observed Shanga apologize several times. Ebony tried to calm appellant down. She observed appellant leave the apartment through the back door and observed appellant re-enter the apartment after Tyia re-entered. After appellant re-entered the apartment, she observed that he was still "in a rage." (Tr. 178.) Appellant stated that someone was going to pay for his doctor bills and he was going to shoot Shanga. Ebony observed appellant go upstairs while she was in the living room. After appellant was upstairs for about five minutes, Ebony saw appellant coming downstairs. While on the stairs, appellant looked over the banister, pointed a gun at Shanga, and fired it. According to Ebony, "Shanga turned around, grabbed his neck, and he kind of stumbled to the kitchen and hit the floor." (Tr. 180.)
 {¶ 16} Timothy Dorn is a detective of the Columbus Division of Police assigned to the Crime Scene Search Unit. Detective Dorn arrived at the crime scene at 2819 Grosse Point Road between 1 and 1:15 a.m. on March 6, 2002. The crime scene had already been secured by other police officers by the time Detective Dorn arrived. Detective Dorn took photographs of the crime scene and the victim. He collected four .22 caliber shell casings. Detective Dorn opined that the shell casings were ejected from a semi-automatic pistol and that shell casings are usually ejected to the right, or to the rear of the direction the gun is pointed. Detective Dorn marked the location in the apartment where each spent shell casing was found and took photographs of the marked locations. All four of the shell casings were found in the living room of the apartment.
 {¶ 17} Detective Dorn found evidence of two bullet strikes in the living room wall. One of the bullet strikes was located near the entrance to the kitchen. Although he dug into the wall, he was unable to recover a bullet.
 {¶ 18} Dorothy Dean, M.D., is a forensic pathologist employed as a deputy coroner by the Franklin County Coroner's Office. On March 6, 2002, Dr. Dean performed an autopsy on the body of Shanga Lane. She found two bullet wound injuries. There was a nonfatal neck wound caused by a bullet moving from the front to the back of the neck. The shot was slightly to the right and downwards on the neck. The bullet perforated the soft tissue of the neck and exited the body at the rear of the neck. The fatal shot entered the left side of the victim's skull just inside the hairline. It traveled up through the brain where it rested. Dr. Dean removed the bullet fragment.
 {¶ 19} Dr. Dean examined the victim's hands and found no bruises, abrasions, or lacerations. Dr. Dean's opinion as to the cause of death was that Shanga Lane died of a gunshot wound to the head with perforation of the skull and brain.
 {¶ 20} Dr. Dean also analyzed the victim's blood for alcohol, which was found to be at .30, indicating a high level of alcohol intoxication at the time of death. The victim also had marijuana in his system.
 {¶ 21} Dr. Dean opined that the bullet path for the nonfatal neck wound is consistent with the shooter being elevated with respect to the victim. The fatal head wound is consistent with the victim turning his head and having his head slightly down.
 {¶ 22} Dr. Dean found no evidence of stippling on either wound. Stippling occurs when the weapon being fired is in close proximity to the victim's skin. Stippling involves small abrasions to the victim's skin caused by the hot gas and unburned gun powder from the fired weapon.
 {¶ 23} The defense called four witnesses to testify at trial: (1) Detective Robert Viduya of the Columbus Police Department, (2) Donna Obadina, appellant's aunt, (3) Karen Lane, appellant's mother, and (4) appellant.
 {¶ 24} After his arrest at his mother's residence located in Columbus, Ohio, appellant was brought to Detective Viduya for questioning sometime between 9 and 9:30 a.m. on March 6, 2002, approximately nine hours after the shooting of Shanga Lane. After being advised of his constitutional rights, appellant agreed to be interviewed by Detective Viduya. The interview was videotaped.
 {¶ 25} Appellant informed Detective Viduya that as he was leaving the scene of the shooting, he fell in a grassy area away from the scene. He removed a magazine from the .22 caliber pistol that was used in the shooting and threw the pistol in a sewer grate. He threw the magazine in a grassy area. Detective Viduya and his partner went out to search all of the sewer grates in the area that appellant described but were unable to find the pistol.
 {¶ 26} Appellant stated to Detective Viduya that he had been drinking and he was "high" at the time of the shooting. (Tr. 241.) Appellant admitted to Detective Viduya that he had been drinking hard liquor and smoking marijuana during the birthday party.
 {¶ 27} After Detective Viduya refreshed his recollection by reviewing the videotape of his interview of appellant, he testified that appellant complained that his ribs were hurting and that he had some back injuries. Appellant also told Detective Viduya that his face was injured but Detective Viduya testified that "the injuries had gone away by the time we interviewed him." (Tr. 355.) Under cross-examination, Detective Viduya testified that appellant never pulled up the "black hoody" that he was wearing to show any bruising on his ribs. (Tr. 356.) Detective Viduya also testified on cross-examination that appellant's eye did not appear to be swollen and he did not notice any abrasions or contusions to the face other than the "split lip." (Tr. 356.)
 {¶ 28} Donna Obadina, appellant's aunt, lives in a house located about a five-minute walk from Tyia's apartment where the shooting occurred. Donna testified that in the early morning hours of March 6, 2002, she was awakened by a banging on her door. Donna lives with her daughter and grandson. She let appellant and appellant's girlfriend, Latrina Morgan, into her house. Donna testified that appellant "collapsed in my arms" and that he was "gasping for a breath" and "spitting up blood." (Tr. 252.) She testified that she first laid appellant down in her front room and then took him to her bedroom and laid him down there. She removed appellant's white t-shirt. "There was a lot of blood at the bottom of the shirt and blood coming down the center." (Tr. 254.)
 {¶ 29} Donna testified that she administered first aid to appellant and she cleaned his mouth out. She wanted to take appellant to the emergency room but he did not want to go. She applied ice wrapped in towels to appellant's ribs because appellant was complaining that his ribs ached. Donna testified that she observed bruises around appellant's ribcage. Donna crushed an aspirin so that appellant could swallow it for the pain. Appellant told Donna that he had been in a "terrible fight." (Tr. 256.) Donna phoned appellant's mother, who asked that Donna bring appellant to her house. Donna gave appellant something "like a shirt" to wear and then drove appellant to his mother's house.
 {¶ 30} Donna observed that appellant appeared intoxicated during the time that she was administering first aid to appellant. Donna was unaware at that time that Shanga Lane had been shot.
 {¶ 31} Karen Lane, appellant's mother, testified that after her sister pulled up to her house, she came outside to help appellant walk into her house. Karen took one side of appellant and Latrina Morgan took the other. Appellant was complaining that his ribs were hurting. Karen testified that appellant's "whole t-shirt was covered with blood." (Tr. 293.) Appellant was helped to his room and then he "started throwing up chunks of blood." Id. "He was scared, he was in shock and he was crying." (Tr. 294.) Karen and Latrina had to cut appellant's shirt in order to remove it. Appellant told his mother that he had gotten into a fight. According to Karen, she observed that the lower lid of appellant's eye "was kinda hanging" and "his lip was busted." (Tr. 294-295.)
 {¶ 32} Appellant and his girlfriend were then left to stay in appellant's room. When Karen awoke that morning, she saw her son's picture on television and heard that he was wanted for shooting his cousin. Karen then went to her son's room and told him that she was going to call the police so that he could turn himself in. Appellant "started crying and saying he didn't mean to do it." (Tr. 298.) After Karen made the call, the police came out to her house to arrest appellant.
 {¶ 33} Appellant testified on his own behalf at trial. Appellant's testimony began with his recounting of an incident regarding Tyia's ex-boyfriend, whom appellant knew as "Tone." While appellant and his girlfriend were staying at Tyia's, Tone unexpectedly arrived at Tyia's apartment early in the morning of March 5, 2002. According to appellant, Tyia let Tone come inside her apartment. Tone was "in a fit of rage," asking where "the keys were to the car." (Tr. 312-313.) Tone momentarily left the apartment and then returned. During this time, appellant gave Tyia his gun. Tyia then went outside with Tone where they argued. According to appellant, after Tone left, appellant persuaded Tyia to call the police.
 {¶ 34} Appellant testified that later that day, Shanga came over to Tyia's apartment to see appellant. Shanga's sister, Sheyoshi, dropped Shanga off. Before the birthday party started, Shanga and appellant drank beer and were "having a good ole time smoking weed." (Tr. 316.) At one point, appellant, Shanga, Tyia, Ebony and Ebony's boyfriend made a trip to a liquor store to purchase liquor. They returned to Tyia's apartment around 7 p.m. Thereafter, appellant made another trip with Tyia to see appellant's friend about some money. During this trip, Tyia gave the gun back to appellant and appellant put the gun in his back pocket. They again returned to Tyia's apartment where the party was going on.
 {¶ 35} According to appellant, he then got into an argument with Sheyoshi about the incident with Tone. Sheyoshi blamed appellant for failing to stop Tone from going through Tyia's apartment. Appellant told Sheyoshi: "I didn't need to be in that with Tyia." (Tr. 318.)
 {¶ 36} According to appellant, Sheyoshi started cursing and pointing her finger at appellant. Appellant cursed her back. According to appellant, Shanga then moved his sister out of the way and struck appellant on the lip. On his way out the back door, appellant was hit in the back of the head by his other cousin, Jonathan Wilder. Appellant denies that he and Shanga were play-boxing as the state's witnesses have testified.
 {¶ 37} According to appellant, while he was outside at the rear patio, Tyia came outside to ask if he was all right. Appellant started yelling: "I had to go to the hospital. Who is going to pay my doctor bill?" (Tr. 322.) Tyia asked appellant to come back into the apartment and she would clean him up. Appellant decided to go back inside to get his girlfriend because he "was afraid for her safety." (Tr. 323.) Appellant was outside with Tyia "a couple of minutes." Id.
 {¶ 38} When appellant re-entered the kitchen through the rear door, Sheyoshi began "cussing" at appellant again. (Tr. 324.) Sheyoshi called appellant a "bitch" and appellant then called her a "bitch." (Tr. 324-325.) After Sheyoshi hit appellant, he tried to go out the back door again, but his exit was blocked by Jonathan Wilder. Then Shanga struck appellant, causing him to fall to the ground. While appellant was on the living room floor, he was stomped on and kicked by Jonathan, Ebony, Tyia, Shanga, and Sheyoshi. Appellant was kicked in his sides and in his face. According to appellant, he then pulled the gun out of his right back pocket while he was "curled up in a ball." (Tr. 326.) "As soon as I did that, I felt someone grab my wrist. As I fell, someone grabbed my wrist, I just shot." Id. Appellant admits firing the gun three times.
 {¶ 39} According to appellant, the kicking stopped after the gun went off. Appellant remembers getting up and, as he was leaving through the front door, he saw Shanga fall.
 {¶ 40} Appellant admitted on the stand that he threw the gun "down the sewer" after he ran from Tyia's house. (Tr. 329.) Appellant's girlfriend called him by cell phone. Appellant then met his girlfriend in front of his aunt's house.
 {¶ 41} The jury returned guilty verdicts for aggravated murder with specifications and for tampering with evidence. The court found appellant guilty of having a weapon under disability. The court held a sentencing hearing on May 29, 2003, and filed its judgment entry on June 3, 2003.
 {¶ 42} On appeal, appellant sets forth the following two assignments of error:
I. The jury's verdict of aggrevated murder was against the manifest weight of the evidence.
II. The trial court erred when it entered judgment against the appellant when the evidence was insufficient to sustain a conviction of aggrevated murder.
 {¶ 43} Because appellant's assignments of error are interrelated, we shall address them together.
 {¶ 44} Sufficiency of the evidence and manifest weight of the evidence are distinct legal concepts. In State v. Sexton,
Franklin App. No. 01AP-393, 2002-Ohio-3617, at ¶ 30-31, this court discussed those distinctions as follows:
To reverse a conviction because of insufficient evidence, we must determine as a matter of law, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could not have found the essential elements of the crime proved beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. Sufficiency is a test of adequacy, a question of law. State v.Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, citingState v. Robinson (1955), 162 Ohio St. 486, 124 N.E.2d 148. We will not disturb a jury's verdict unless we find that reasonable minds could not reach the conclusion the jury reached as the trier of fact. Jenks, supra, at 273, 574 N.E.2d 492. We will neither resolve evidentiary conflicts in the defendant's favor nor substitute our assessment of the credibility of the witnesses for the assessment made by the jury. State v. Willard (2001),144 Ohio App.3d 767, 777-778, 761 N.E.2d 688; citing State v.Millow (2001), Hamilton App. No. C-000524. A conviction based upon legally insufficient evidence amounts to a denial of due process. Thompkins, supra, at 386, 678 N.E.2d 541, citingTibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211,72 L.Ed.2d 652; and if we sustain appellant's insufficient evidence claim, the state will be barred from retrying appellant.Willard, supra, at 777, 761 N.E.2d 688, citing State v.Freeman (2000), 138 Ohio App.3d 408, 424, 741 N.E.2d 566.
A manifest weight argument, by contrast, requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. State v. Brooks (2001), Franklin App. No. 00AP-1440, at 21, citing Thompkins, supra, at 387, 678 N.E.2d 541. Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. State v. Bezak (1998), Summit App. No. C.A. 18533, at 7-8, citing State v. DeHass (1967), 10 Ohio St.2d 230, 231,227 N.E.2d 212. Nonetheless, we must review the entire record. With caution and deference to the role of the trier of fact, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury, as the trier of facts, clearly lost its way, thereby creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. Id., at 5-6,227 N.E.2d 212, citing Thompkins, supra, at 387, 678 N.E.2d 541.
 {¶ 45} R.C. 2903.01(A) defines the offense of aggravated murder: "No person shall purposely, and with prior calculation and design, cause the death of another[.]"
 {¶ 46} Prior calculation and design requires something more than instantaneous deliberation. State v. Cotton (1978),56 Ohio St.2d 8, paragraph two of the syllabus. Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme design to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified. Id., paragraph three of the syllabus.
 {¶ 47} There is no bright line test to determine whether prior calculation and design are present. Rather, each case must be decided on a case-by-case basis. State v. Taylor (1997),78 Ohio St.3d 15, 18-20. While momentary deliberation is insufficient, a time span as short as two or three minutes can be sufficient for prior calculation and design. Taylor, at 22.
 {¶ 48} Appellant contends that the evidence is insufficient to show prior calculation and design. Appellant argues that he could not have devised a scheme designed to implement a calculated decision to kill while he was being beaten at the time of the shooting. Appellant's contention is seriously flawed.
 {¶ 49} Appellant's contention ignores the requirement in determining sufficiency of the evidence that this court view the evidence in a light most favorable to the prosecution. Appellant's contention is improperly premised upon appellant's view of the evidence in a light most favorable to appellant. Viewing the evidence in a light most favorable to the prosecution on the question of prior calculation and design, between the play-boxing that resulted in a busted lip and the shooting of Shanga, appellant had ample time and opportunity to devise a scheme designed to implement a calculated decision to kill. After receiving the busted lip, appellant exited Tyia's apartment through the rear door. Tyia followed appellant onto the patio where appellant told Tyia that "Somebody is going to die." Appellant was outside on the patio with Tyia for two or three minutes. After Tyia re-entered the apartment to go upstairs to her bathroom, appellant also re-entered through the rear door. Sheyoshi heard appellant yell to those in the kitchen: "One of you mother fuckers is going to pay." Appellant then went upstairs where Tyia attempted to calm him down in the bathroom. Appellant then went down the stairs with his .22 caliber semi-automatic and fired four shots in Shanga's direction. Two of those shots struck appellant's intended victim. Ebony Wilder observed that appellant was upstairs about five minutes before he came down the stairs to shoot Shanga.
 {¶ 50} Viewing the evidence in a light most favorable to the prosecution, the evidence is sufficient to support the view that appellant devised his scheme to kill Shanga with his .22 caliber semi-automatic while on the outside patio and that he implemented his scheme by going upstairs to obtain his gun and then coming down the staircase to a position where he could shoot Shanga and quickly exit through the front door to escape.
 {¶ 51} The evidence is clearly sufficient to support the element of prior calculation and design in the conviction for aggravated murder.
 {¶ 52} Regarding appellant's manifest weight argument, this court's review of the evidence fails to show that the jury lost its way or created a manifest miscarriage of justice.
 {¶ 53} The jury apparently believed the testimony of Sheyoshi Lane, Tyia Wilder, and Ebony Wilder as to how the shooting occurred. The jury found that appellant fired his weapon at Shanga Lane while standing on the staircase. The jury did not believe appellant's testimony that he pulled a gun from his back pocket while being kicked by his relatives on the living room floor and then fired the gun in no particular direction as someone grabbed his wrist.
 {¶ 54} Appellant contends that the state's testimony indicating that he fired his gun from the stairs is inconsistent with the testimony of Detective Dorn and Deputy Coroner Dorothy Dean. On the basis of these alleged inconsistencies, appellant contends that this court should discredit the testimony of Sheyoshi Lane, Tyia Wilder, and Ebony Wilder and find that the jury lost its way in believing those witnesses. We disagree with appellant's contentions.
 {¶ 55} Detective Dorn testified that he found all four shell casings on the living room floor. He further testified that a semi-automatic usually ejects its shell casings to the right or to the rear of the direction the gun is pointed.
 {¶ 56} Sheyoshi Lane testified that appellant pointed the gun over the stairway rail while firing at Shanga. Ebony Wilder testified that appellant looked over the banister, pointed the gun at Shanga and fired it.
 {¶ 57} According to appellant, had he shot the gun from the stairs, the shell casings would have been found on the stairs rather than in the living room. Interestingly, during cross-examination, appellant never asked Detective Dorn whether finding the shell casings on the living room floor was inconsistent with the state's view that appellant fired the gun from the stairs, even though Detective Dorn was familiar with the interior arrangement of Tyia's apartment as well as the mechanics of semi-automatic handguns.
 {¶ 58} Nevertheless, given the state's testimony that appellant pointed the gun over the stairway rail and that semi-automatics can eject shell casings to the right, it is certainly conceivable that the four shell casings would come to rest in the living room where they were found by Detective Dorn. This is particularly so given the close proximity of the living room to the stairs from where appellant fired his gun. Certainly, the jury could reasonably find, based upon the evidence presented, that there was no inconsistency between the state's testimony that appellant fired his gun from the stairs and Detective Dorn's testimony that he found all four shell casings in the living room.
 {¶ 59} Dr. Dean testified that the nonfatal neck wound is consistent with the shooter being elevated with respect to the victim. She further testified that the fatal head wound is consistent with the victim turning his head and having his head slightly down. Dr. Dean also found no evidence of stippling at either wound.
 {¶ 60} Ebony Wilder testified that, after appellant fired his gun on the stairs, Shanga "turned around, grabbed his neck and he kind of stumbled to the kitchen and hit the floor." Sheyoshi testified that appellant pointed the gun over the stairway rail, thus indicating that appellant was elevated with respect to Shanga. We find no inconsistency between the testimonies of Ebony and Sheyoshi and the testimony of Dr. Dean based upon the evidence before this court.
 {¶ 61} Having reviewed the entire transcript of the trial proceedings, we find that the jury did not lose its way or create a manifest miscarriage of justice.
 {¶ 62} Based upon the foregoing, both of appellant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Klatt and Wright, JJ., concur.
Wright, J., retired of the Supreme Court of Ohio, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.