OPINION
{¶ 1} After a jury trial, Defendant-Appellant Charles Davis was convicted of tampering with evidence (Count IV), having weapons under disability (Count V), and two counts of involuntary manslaughter, both with a firearm specification (Counts III and VIII). The jury found Davis not guilty of two counts of murder (Counts I and II), and the court granted a Crim. R. 29 motion for acquittal on charges of receiving stolen property and trafficking in drugs (Counts VI and VII, respectively). Davis was subsequently sentenced to the following terms of imprisonment: five years on Count III; five years on Count IV; 11 months on Count V; ten years on Count VIII, and three years on each firearm specification. Counts III and V were merged with Count VIII, and the sentences for the firearm specification were combined and made consecutive to, and prior to, the other sentences. Since the court also ordered the sentence for Count IV to be served consecutive to the sentence for Count VIII, the total aggregate sentence of imprisonment was 18 years.
 {¶ 2} Davis now appeals, raising the following assignments of error:
 {¶ 3} "I. The Appellant was denied his right to a speedy trial when the court overruled the Appellant's Motion to Dismiss Count VIII of the indictment.
 {¶ 4} "II. The trial court erred and abused its discretion in reconvening the jury to return a second verdict on Count Eight of the indictment after the jury's initial verdict on that count had been accepted and the jury had been discharged.
 {¶ 5} "III. Because the record demonstrates that there was improper contact with the jury during deliberations, the Defendant was denied a fair trial and his convictions must be reversed.
 {¶ 6} "IV. Because the Appellant was never accused of the offense of involuntary manslaughter for causing the death of Randall Powers as the proximate result of committing the offense of reckless assault, Appellant was denied his right to a fair trial and to due process of law. Accordingly, the Defendant's conviction on Count III of the indictment must be reversed.
 {¶ 7} "V. The State's repeated attempts to introduce evidence of other acts of the Defendant's bad character through improper questions, objections to which were only occasionally sustained, denied Appellant a fair trial.
 {¶ 8} "VI. Appellant's conviction on Count VIII is supported by insufficient evidence.
 {¶ 9} "VII. The trial court erred and abused its discretion in sentencing the Defendant to maximum consecutive sentences."
 {¶ 10} Upon consideration, we find that the second assignment of error should be sustained and that the seventh assignment of error should be sustained in part. The remaining assignments of error are either moot or without merit. Accordingly, the conviction and sentence on Count VIII will be vacated, and the imposition of a consecutive sentence on Count IV is also vacated. This matter will be remanded for re-sentencing consistent with this opinion.
 I {¶ 11} The charges against Davis arose from the events of September 16 and 17, 2001, which ended in the death of Randall Powers from a gunshot wound to the chest. Davis admitted shooting Powers, but claimed it was an accident. The State's theory of the case was that Davis intentionally shot Powers because of a dispute over money, use of a garage, or an assault rifle.
 {¶ 12} At the time of the shooting, Powers and Davis had been friends for about nine years. About three or four years before his death, Powers spent several weeks at Greene Memorial Hospital for drug rehabilitation. At that time, Powers had custody of his two sons, Justin and Dustin. The boys lived with their aunt and uncle while their father recovered, and were reunited with him in the fall of 1998. The family then moved to Elbron Avenue, where they lived until Powers' death in September, 2001. According to the boys, their father only drank alcohol for about a year after being released from rehabilitation. However, he again began to use drugs, and also continued abusing alcohol up to the time of his death.
 {¶ 13} The State's theory of the motive for the shooting was not well-defined, but it appears to have been based on an alleged dispute between Davis and Powers over Powers' refusal to store Davis' automobile in his garage. The implication was that Powers owed Davis money for drugs, and that use of the garage would have satisfied the debt.
 {¶ 14} To establish these facts, the State elicited testimony from Powers' sons regarding an occasion on which they had seen Davis give their father drugs. Powers also had cocaine metabolites in his system at the time of death, but the coroner could not tell how long before death the cocaine was taken. In addition, the police did not find any drugs or evidence of drug consumption at the crime scene (Davis' home). Powers' blood alcohol level was over the legal limit at the time of death, and there was evidence that both men had been drinking alcohol the night the shooting took place.
 {¶ 15} The State did offer testimony suggesting that Davis owed Powers money, and that the men had argued during the week before the shooting about whether Davis could store an auto in Powers' garage. In this regard, Powers's sons indicated that Davis had previously stored some stolen autos in their father's garage, had removed auto parts for sale, and had then dumped the autos in a local quarry. These activities took place about three years before the September, 2001 shooting. One of Powers' sons also testified that Powers and Davis had words the night of the shooting about Davis' request to store a car in the garage. The implication of this evidence was that Davis again wanted to store and strip cars, but that Powers refused, creating a motive for the shooting — or at the least, demonstrating ill will between the two men.
 {¶ 16} Other witnesses reported, however, that the two men were not angry with each other the night of the shooting. Davis also presented evidence that the car was his own (not stolen), and that he had made arrangements before the shooting to store the garage at another location.
 {¶ 17} Some months before the shooting, Davis brought an AK-47 assault rifle to Powers' house, so that Powers could store the rifle in his safe. An unknown party had stolen the assault rifle from the original owner more than six years previously. Davis testified that he had gotten the rifle from a friend about seven months before the shooting, and did not know it was stolen.
 {¶ 18} In any event, on the night of September 16, 2001, Davis asked Powers to bring the assault rifle back to his house. Evidence in the record suggested a possible dispute between Powers and Davis about ownership of the rifle. Davis indicated, however, that he needed the rifle that night for protection because he had heard a rumor that people from Detroit (identified only as "L" and "T") were looking for Davis and were going to "come into" his house. Allegedly, "L" had been shot a year earlier by Davis' friend (Lonnie Dozier), because "L" had wrecked a car that Dozier had entrusted to "L." Unfortunately, Dozier was currently in prison, and Davis was the only candidate available for revenge.
 {¶ 19} When Davis called the night of September 16, Powers was at home with his two sons. Powers left with the rifle at about 10:00 p.m., telling his sons he would be home in fifteen minutes. When Powers arrived at Davis' house, Davis and his brother, Corey Brim, were sitting on the porch, drinking brandy. Powers took a bag (with the gun inside), into the house. The three men then continued to drink for a while. Brim left about 11:30 p.m., and Powers and Davis began talking about the people from Detroit. Powers suggested that they try to find the men, so Powers and Davis left around midnight, with the rifle. Before they left, Davis took the telephone upstairs to his girlfriend, Jessica, who was sleeping, in case something happened while he was gone. The two men then drove by apartments where they thought the Detroit people might be staying. However, they did not stop. Around 1:00 a.m., they did stop at the home of Tetra Harrison, who had lived with Dozier before he went to prison. Davis and Powers asked Harrison about the men from Detroit, but she did not know anything. Consequently, the two men left Harrison's home around 1:45 a.m., and returned to Davis' house.
 {¶ 20} The events that transpired from then on are known only to Davis. According to Davis, he and Powers watched television for a while. Powers then said he was going to leave. Powers asked Davis what he wanted to do about the men from Detroit, since there was another place they could have checked. Powers also asked Davis if he was scared. As Powers talked, he picked up the gun and started to point it at himself. Davis had previously chambered the gun and did not think Powers was aware of it. As a result, Davis grabbed the gun, and also tripped over Powers' feet. In the process, the gun went off, with a single bullet striking Powers in the chest.
 {¶ 21} After the shooting occurred, Davis ran upstairs to get the phone and call 911. He also asked Jessica to check on Powers. During the subsequent 911 call, the dispatcher asked what happened, and Davis said, "It's — it's just a bunch of dumb shit. We was drinking." Davis did tell the dispatcher, after being asked, that the shooting was accidental. However, when the dispatcher asked about the gun, Davis stopped talking. He explained later that he realized then that the weapon was illegal and ran outside to hide it. Just as Davis returned to the house, the police arrived. Davis was very upset and did not respond to questions from the police about the location of the gun or the "shooter."
 {¶ 22} The police left an officer on the porch to guard Davis and went inside, where they found Powers sitting on the couch, with a single gunshot wound to the chest. Powers was dead, and there were no signs of a struggle. Subsequently, Davis was taken to the police station and questioned for about four hours, but he generally refused to answer questions. Tape recordings of the interrogation were suppressed prior to trial. However, the State was allowed to submit transcripts of the recording for impeachment purposes, after Davis took the stand. The recordings show some inconsistencies with Davis's trial testimony, even though many comments on the recordings are incoherent.
 {¶ 23} During trial, the court dismissed charges of drug trafficking and receiving stolen property. The remaining charges were submitted to the jury, which found Davis guilty on two counts of involuntary manslaughter (Counts III and VIII), on one count of tampering with evidence, and on one count of having a weapon under disability. Due to irregularities regarding the jury instructions and verdict form for Count VIII, the trial court recalled the jury after it had been dismissed. After the jury was given a new verdict form and further instructions, it again found Davis guilty on Count VIII.
 {¶ 24} Davis appeals from his conviction and sentence, raising seven assignments of error.
 II {¶ 25} The first of assignment of error is based on the claim that Davis' speedy trial rights were violated when the trial court refused to dismiss Count VIII of the indictment. Davis was arrested on September 17, 2001, and was originally indicted on September 24, 2001, on two counts of murder with firearm specifications (Counts I and II), one count of involuntary manslaughter in violation of R.C. 2903.04(B) with a firearm specification (Count III), one count of tampering with evidence (Count IV), one count of having a weapon while under disability (Count V), one count of receiving stolen property (Count VI), and one count of trafficking in cocaine (Count VII).
 {¶ 26} On September 28, 2001, Davis pled not guilty and a $500,000 cash surety bond was set. However, Davis remained in jail during the entire proceedings. Subsequently, on November 13, 2001, Davis's original counsel filed a motion to withdraw, and new counsel entered an appearance on November 19, 2001. The original trial date was continued on November 26, 2001, at Davis's request. Davis also filed a motion to suppress evidence on December 4, 2001. Shortly thereafter, on December 10, 2001, Davis filed a waiver of his right to a speedy trial.
 {¶ 27} On February 25, 2002, a second indictment was filed, charging Davis with involuntary manslaughter as a proximate result of attempting to commit a felony in violation of R.C. 2903.04. This charge also included a firearm specification. On February 28, 2002, Davis filed a motion to dismiss the second indictment on speedy trial grounds, but the trial court denied the motion. The court then consolidated the two cases and designated the additional involuntary manslaughter charge as Count VIII. By our calculation, 158 days elapsed between the arrest date and the second indictment. However, only 84 days elapsed between the arrest and the waiver of speedy trial rights on the original indictment. Therefore, the issue is whether the original waiver applies to the second indictment.
 {¶ 28} According to Davis, the trial court erred in denying his motion to dismiss Count VIII, because it was based on the same facts as the original indictment. The State contends, however, that the speedy trial waiver also applied to the second indictment, because Count VIII was a lesser-included offense to charges in the original indictment.
 {¶ 29} The right to a speedy trial is guaranteed by theSixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. Under R.C. 2945.71(C)(2), defendants charged with felonies must be brought to trial within 270 days, or within 90 days if they are jailed while awaiting trial. These provisions are strictly construed against the State. State v. Singer (1977), 50 Ohio St.2d 103,108-09. Defendants may waive their right to a speedy trial. State v.King (1994), 70 Ohio St.3d 158, 160. However, waivers must be made knowingly, voluntarily, and intelligently. State v. Adams (1989),43 Ohio St.3d 67, 69.
 {¶ 30} In Adams, the Ohio Supreme Court considered whether a defendant's waiver of speedy trial rights for an initial charge of driving while having a prohibited concentration of alcohol applied to a subsequently-filed charge of operating a vehicle while under the influence of alcohol. Both charges stemmed from the same set of facts, but involved different subsections of R.C. 4511.19(A). Ultimately, the Ohio Supreme Court decided that the initial waiver did not apply to the additional charge. In particular, the court stressed that: "[u]naware that his original waivers could affect the course of a subsequent charge, * * * [defendant] did not have sufficient knowledge of the consequences of his actions at the time he executed the waivers." Id. at 69.
 {¶ 31} Although both charges in Adams involved the same set of facts, the Ohio Supreme Court focused on the fact that the charges could involve different defenses at trial. The court concluded that because of these differences, a defendant might waive speedy trial rights for one charge, but might not be willing to waive a speedy trial for the other. Id. at 69-70. Accordingly, the court held that "a knowing and intelligent waiver cannot be made until all the facts are known by the accused, which includes knowing the exact nature of the crime he is charged with." Id. at 70.
 {¶ 32} Consistent with the above authority, Davis claims his waiver of speedy trial rights cannot apply to a subsequent charge that is based on the same set of circumstances as the original indictment. We disagree, however, because the concerns expressed in Adams are absent when the subsequent charge is a lesser-included offense of an initial charge. Specifically, in such cases, waiving defendants are aware of the exact nature of the crimes with which they are charged, since "the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed." Statev. Deem (1988), 40 Ohio St.3d 205, 206, paragraph three of the syllabus. Because the greater offense requires proof of one or more additional elements, it may involve considerations of defense that would not be contemplated in defending against the lesser-included offense, but not vice versa.
 {¶ 33} The Ohio Supreme Court has held that involuntary manslaughter under R.C. 2903.04 is a lesser included offense of "aggravated murder with prior calculation and design, R.C. 2903.01(A), aggravated felony murder, R.C. 2903.01(B), and murder, R.C. 2903.02."State v. Lynch, 98 Ohio St.3d 514, 526, 2003-Ohio-2284, ¶ 79. We have likewise said that "[i]nvoluntary manslaughter is always and necessarily a lesser included offense of murder because murder cannot ever be committed without also committing or attempting to commit a felony or misdemeanor." State v. Lawrence (Dec. 19, 1997), Montgomery App. No. 16317, 1997 WL 822719, *4. Thus, because Davis was charged with murder under R.C. 2903.02, his speedy trial waiver for that charge applied to the lesser-included offense of involuntary manslaughter under R.C. 2903.04. Accordingly, the trial court did not violate Davis' speedy trial rights by refusing to dismiss the indictment for Count VIII.
 {¶ 34} Based on the preceding discussion, the first assignment of error is without merit and is overruled.
 III {¶ 35} In the second assignment of error, Davis contends that the trial court erred and abused its discretion by reconvening the jury to return a second verdict on Count VIII of the indictment after the jury returned a verdict and was discharged. The third assignment of error raises questions about the jury deliberations, because the jury somehow received two different verdict forms for Count VIII. Since these issues are related, we will discuss them together.
 {¶ 36} As we mentioned, Davis was charged in Count VIII with causing the death of Powers "as a proximate result of committing or attempting to commit a felony, in violation of Section 2903.04 of the Ohio Revised Code." In a bill of particulars, the State indicated that this charge was based on the fact that Davis "possessed and used a Norinco model assault rifle after having been convicted of a felony of violence, Assault of a Police Officer on June 12, 1996. This caused the death of Randall D. Powers who was shot in the chest."
 {¶ 37} At the end of the trial, the judge charged the jury on two counts of involuntary manslaughter. The first, Count III, was based on the claim that Davis caused Powers' death as a proximate result of committing a misdemeanor of reckless assault. The second, Count VIII, was based on allegations that Davis caused Powers' death while committing a felony. Concerning this count, the judge instructed the jury that:
 {¶ 38} "the legal basis [sic] involuntary manslaughter alleged in this charge, Count 8, is causing the death of another as a proximate result of committing a felony of having a weapon under disability.
 {¶ 39} "The offense of having a firearm under disability is that the defendant knowingly had, carried, or used a firearm and was previously convicted of a felony offense of violence, to wit, assault on a police officer in the Clark County, Ohio, Common Pleas Court on March 21, 1996, in Case No. 95-CR-0343.
 {¶ 40} "Before you can find the defendant guilty of involuntary manslaughter as charged in Count 8, you must find beyond a reasonable doubt that on or about the 17th day of September, 2001, and in Clark County, Ohio, the defendant as a proximate result of knowingly having or using a firearm after having been convicted of a felony of violence caused the death of Randall Powers."
 {¶ 41} After defining the various offenses, the judge read the proposed verdict forms to the jury. Concerning Count VIII, the judge said:
 {¶ 42} "Then the verdict in Count 8, which also contains the involuntary manslaughter reads: `We, the jury, duly impaneled and sworn, do find the defendant, Charles E. Davis.' There's a blank space preceded by the asterisk. Complete the blank space with the words `guilty' or `not guilty of involuntary manslaughter while committing the offense of negligent assault in Count 8 of the indictment.' "
 {¶ 43} No objections were made to the charge, other than to the omission of a word from the instruction for Count III. After the judge clarified that instruction, the jury was sent to deliberate at about 4:48 p.m.
 {¶ 44} Around 8:10 p.m., the jury returned with a verdict, finding Davis guilty of involuntary manslaughter in Counts III and VIII. However, the verdict form read by the foreman was that:
 {¶ 45} "We, the jury, being duly impaneled and sworn, do find the defendant, Charles E. Davis, guilty of involuntary manslaughter while committing felonious assault as charged in Count 8 of this indictment. We further find and specify that the defendant, Charles E. Davis, did have a firearm on or about his person while committing this offense and displayed the firearm, brandished the firearm, or indicated that he possessed the firearm of used it to facilitate the offense."
 {¶ 46} The judge then reviewed the verdicts, accepted the verdicts as correctly read by the foreman, and discharged the jury at 8:13 p.m. After the jury was discharged, counsel for both sides approached the bench to review the verdicts, but did not comment on the verdicts. The judge then set a sentencing hearing for the following morning and recessed the proceedings at 8:15 p.m.
 {¶ 47} However, the judge reconvened the proceedings about two hours later. At that time, defense counsel noted an irregularity in one of the jury forms, and asked that the verdict for that count (VIII) be dismissed. The judge agreed that the verdict for causing death by felonious assault on Count VIII was inconsistent with the charged offense, i.e, causing death while having a weapon under disability. Nonetheless, the judge concluded that the error was "typographical" and declined to dismiss the charge. He then reconvened the jury for further deliberations.
 {¶ 48} As part of the process, the judge asked the jurors if they had been improperly influenced by any contacts upon leaving the courthouse. The judge also ascertained that the jurors were willing to continue deliberating that evening. After the jurors agreed to continue, they were re-instructed on Count VIII. They also received a verdict form that correctly asked if Davis were guilty of involuntary manslaughter as a proximate result of committing the offense of having weapons under disability. Following a very brief deliberation, the jury returned the verdict form, finding Davis guilty, as charged, on Count VIII. Subsequently, the judge, over defense objection, asked the jury if this was the verdict they had originally intended to return on Count VIII. After the jury responded affirmatively, the court again stressed that the earlier verdict had contained a "typographical" error. The court then asked the jury to affirm a second time that this was the verdict it had originally intended to return, but for the typographical error. Following the jury's second affirmative response, the court accepted the verdict and discharged the jury.
 {¶ 49} Before addressing the substantive issues, we should note that the defective verdict form signed by the jury was not made part of the record. In addition, the record does not reveal what happened to the first, incorrect verdict form for Count VIII, which was read during the trial court's original instructions. The record also does not contain any explanation of how the jury received a second verdict form for Count VIII that was different from the first verdict form, yet was also defective.
 {¶ 50} Turning to the merits of the argument, we find that the defect in the verdict was not merely typographical or one of "form." A verdict is:
 {¶ 51} "defective in form when the language or expression used is imperfect or wanting to correctly express the real intention of the jury, and may be corrected by the jury or by the court with the consent of the jury when or in cases where it can be done without affecting the issues raised by the pleadings or presented by the evidence. A verdict is defective in substance if it is wanting in some real or essential part or element and does not correspond to the issues raised by the pleadings; and the language `defective in substance' may be said to be opposed to or opposite to form or defective in form." Barnes v. Prince (1974),41 Ohio App.2d 244, 245 (citation omitted).
 {¶ 52} Under this standard, the verdict form that the jury originally signed was not simply imperfect in language. To the contrary, it was inconsistent with the instructions given to the jury, did not correspond to the issues raised in the case, and was also inconsistent with the verdict form read to the jury during the charge. However, even if the defect had been only one of form, the trial court erred in allowing the jury to deliberate after discharge. Specifically, a trial court cannot recall a jury to alter or amend its verdict once the jury has been discharged and has separated. See Sargent v. State (1842),11 Ohio 472, 473; Helmerking v. State (5th Dis. Ct. 1852), 1 Ohio Dec. Rep. 444; and State v. Williams (Nov. 29, 1984), Cuyahoga App. No. 48209, 1984 WL 6221.
 {¶ 53} The State argues that Davis has waived any error other than plain error, because he failed to object to the court's charge, and also failed to object when the verdict for Count VIII was read in court. According to the State, the error was not "plain" because the Ohio Criminal Rules and Rules of Civil Procedure do not provide a definitive answer on what procedure is to be followed in situations like the present. The State further claims that the error was not "outcome-determinative" because the trial court assured itself before re-instructing the jury that none of the jurors was subject to any outside influence after the original verdicts. However, the State's arguments miss the point.
 {¶ 54} Davis never consented to the jury's re-deliberating the case after the jury had been discharged. His position, expressed clearly to the trial court, was that the defective verdict should be set aside, and that charge, Count VIII, should be dismissed.
 {¶ 55} Because Davis did not waive the claimed error in the trial court, it is not plain error. It is a claim of structural error, since it challenges the regularity of the jury deliberation. Where structural error is found, prejudice is presumed; prejudice is not required to reverse a judgment tainted by structural error.
 {¶ 56} To the extent that any procedures are set out in the civil or criminal rules, they permit a jury to deliberate further only before discharge. For example, Crim. R. 31(D) states that:
 {¶ 57} "[w]hen a verdict is returned and before it is accepted the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberation before the jury is discharged" (emphasis added).
 {¶ 58} Civ.R. 48 also allows jurors to be polled after a verdict. This rule provides that if more than one-fourth of the jurors answer that the verdict is not their own, or if the verdict in substance is defective, the jurors must be sent out again for further deliberation. Significantly, the rule states that "[i]f the verdict is defective in form only, with the assent of the jurors and before their discharge, the court may correct it" (emphasis added).
 {¶ 59} Clearly, both rules allow action to be taken only before discharge, and neither rule permits action after discharge. This is consistent with established law, as cited above. The reason for the prohibition against deliberation after discharge was expressed many years ago in Sargent, where the Ohio Supreme Court stressed that:
 {¶ 60} "* * * in no case can it be permitted to recall a jury to alter or amend their verdict after it has been received and the jury discharged. This would jeopardize the jealous guards with which the law has surrounded jurors, to insure the pure administration of justice and to protect the citizen." 11 Ohio at 474. See also State ex rel Csank v.Jaffe (1995), 107 Ohio App.3d 387, 391 (noting that the practice of reconvening juries has been condemned because circumstances inherent in a juror's return to the community would severely compromise a jury's integrity).
 {¶ 61} Because the trial court erred in letting the jury deliberate after discharge, the second assignment of error is sustained. Accordingly, Davis' conviction and sentence on Count VIII must be vacated. Since this ruling fully disposes of Count VIII, we need not consider further the issue of any impropriety in the original deliberations due to the presence of two different verdict forms.
 {¶ 62} The second assignment of error is sustained, and the third assignment of error is overruled as moot.
 IV {¶ 63} In the fourth assignment of error, Davis claims his conviction on Count III was improper and a denial of due process because he was never accused of involuntary manslaughter as a proximate result of committing reckless assault. The original indictment for Count III stated that:
 {¶ 64} "on or about September 17, 2001, at Clark County, Ohio Charles E. Davis, did cause the death of another, to-wit: Randall D. Powers as a proximate result of the offender committing or attempting to commit a misdemeanor in violation other than a violation of any Section contained on Title XLV (45) that is a minor misdemeanor or a municipal ordnance (sic) the (sic) is substantially equivalent to any section contained in Title XLV (45) of the Revised Code that is a minor misdemeanor in violation of Ohio Revised Code Section 2903.04(B)."
 {¶ 65} Although the indictment contains some typographical errors, it essentially tracks the language in R.C. 2903.04(B), which prohibits the crime of misdemeanor involuntary manslaughter. The State subsequently filed a bill of particulars, indicating that "[i]n addition to the information contained in Count III of the indictment the defendant used a norinco (sic) model assault rifle while under the influence of alcohol or a drug of abuse or negligently caused the death of Randall D. Powers."
 {¶ 66} On the second day of trial, the State filed a motion to amend the bill of particulars to substitute the word "recklessly" where the word "negligently" appeared. While discussing this point, the State noted that two underlying misdemeanors existed in the case — (1) being under the influence of drugs or alcohol; and (2) negligence. Concerning the latter misdemeanor, the State explained that one element of negligence was physical harm. However, the State felt the evidence at trial was more consistent with serious physical harm, as was required for the misdemeanor of assault. The State also pointed out that Davis would not be prejudiced by the amendment, since the State would be held to a higher burden of proof. The trial court agreed, and allowed the amendment over defense objection.
 {¶ 67} In arguing that this was error, Davis's first point is that the original indictment makes no sense. We disagree. Although the indictment does contain typographical errors, and some extra words are inserted that are not completely in context, we have no difficulty understanding what crime is being alleged.
 {¶ 68} Davis next claims that the indictment improperly lists two charges in Count III, instead of placing each charge in a separate count. Again, we disagree. Under R.C. 2941.04, indictments may charge different statements of the same offense, or may charge two or more different offenses of the same class of crimes of offenses, under separate counts. This requirement is satisfied in the present case because the two charges of involuntary manslaughter are listed in different counts.
 {¶ 69} Count III, itself, contains only one charged offense — involuntary manslaughter as the proximate result of the offender attempting to commit a misdemeanor. The misdemeanor is not specified, but that is not a problem, because manslaughter indictments do not need to plead the specific felony or misdemeanor forming the basis for the charge. See, e.g., State v. Haffey (Sept. 2, 1993), Cuyahoga App. No. 63576, 1993 WL 335443, *6.
 {¶ 70} The bill of particulars does mention two underlying misdemeanors, but Davis does not point to any prohibition against offering more than one factual basis for a charge in the indictment. We have also not been able to find any prohibition against this procedure. We further note that Davis did not challenge the indictment on this ground in the lower court. As a result, he has waived all but plain error. State v. Reynolds, 148 Ohio App.3d 578, 581, 2002-Ohio-3811, ¶ 8. For the reasons just mentioned, we find no error, let alone any plain error.
 {¶ 71} In the remaining discussion of the fourth assignment of error, Davis focuses on the amendment of the bill of particulars that occurred at trial. Davis contends that Count III did not originally contain all the essential elements of the offense and that he was convicted on different evidence than the evidence for which he was indicted. In particular, Davis argues that he went to trial with the understanding that he was charged with involuntary manslaughter as a result of handling weapons while intoxicated. Davis further claims that he would have pled guilty if he had known he was being charged with negligently causing Powers's death, since that charge, at most, is a misdemeanor.
 {¶ 72} We disagree with this analysis. In the first place, the indictment clearly indicates that Davis was not charged merely with a misdemeanor. As a further matter, the bill of particulars states that Davis used an "assault rifle while under the influence of alcohol or a drug of abuse or negligently caused" Powers' death. The use of the disjunctive term "or" indicates two potential grounds of liability, not just one. If the State had intended to link alcohol with negligence, it would have used the word "and." We also note that defense counsel specifically acknowledged at trial that the bill of particulars alleged two underlying misdemeanors.
 {¶ 73} Under Crim. R. 7(D), the court may amend the indictment or bill of particulars at any time before, during, or after trial, "in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." In the present case, the name and identity of the charged crime did not change, as Davis was charged both before and after the amendment with involuntary manslaughter as a proximate cause of committing a misdemeanor.
 {¶ 74} An indictment does not have to recite the evidence supporting various facts. Instead, the indictment must contain "language sufficient to alert the person named therein that certain generally specified conduct constitutes a violation of an existing statute." Statev. Gingell (1982), 7 Ohio App.3d 364, 367. In fact, an indictment "`may be in the words of the applicable section of the statute so long as the words of that statute charge an offense.'" State v. O'Brien (1987),30 Ohio St.3d 122, 124, quoting Crim. R. 7(B).
 {¶ 75} In contrast, the purpose of a bill of particulars is "to provide the accused, upon proper demand, with greater detail concerning the nature of the offense charged and of the criminal conduct alleged to constitute the offense, and is appropriately supplied where the indictment, although legally sufficient in describing the elements of the charged offense, is so general in nature that the accused is not given a fair and reasonable opportunity to prepare his defense."7 Ohio App.3d at 367.
 {¶ 76} In the present case, the indictment was not defective. The bill of particulars did reveal additional information about the criminal conduct alleged to have caused the offense. The conduct was the use of drugs or alcohol or a negligent assault. In fact, the trial court indicated, in discussing the amendment, that it had already used negligent assault in preparing instructions to the jury. The State then remarked that the evidence was more consistent with a simple assault, and that was the reason for changing the term "negligently" to "recklessly."
 {¶ 77} In arguing that the amendment was improper, Davis also relies on State v. Headley (1983), 6 Ohio St.3d 475, which held that an indictment cannot be amended to include the type of a controlled substance involved in an aggravated trafficking charge. In Headley, the indictment alleged that the defendant had knowingly provided money or other items of value to permit others to obtain and sell controlled substances. However, the type of drug was not specified, and the trial court later let the state amend the indictment to identify the drug as cocaine. Id. at 475.
 {¶ 78} The statute in question covered more than one offense, and the severity of the offense was based on the type of drug involved. Id. at 479. As a result, the Ohio Supreme Court held that the identity of the drug was an essential element and had to be included in the indictment. This omission could not be cured by amendment, since the identity of the offense would change. Id.
 {¶ 79} The present case is unlike Headley, however, because the severity of an offense under R.C. 2903.04(B) does not depend on the type of misdemeanor involved. Instead, a defendant who causes the death of another while committing any misdemeanor (with certain non-relevant exceptions), is guilty of involuntary manslaughter.
 {¶ 80} After Headley, the Ohio Supreme Court allowed the State to amend an indictment that failed to include a term of intent required for the crime of endangering children. O'Brien, 30 Ohio St.3d at 124-26. Although intent had previously been held an essential element of that crime, the Supreme Court noted that the crime's name and identity (endangering children) remained the same after the indictment was amended. Moreover, neither the penalty nor the degree of child endangering changed as a result of the amendment.
 {¶ 81} This is the situation that exists in the present case. InO'Brien, the court did go on to find that the substance of the indictment had changed. Consequently, the Ohio Supreme Court considered, as required by Crim. R. 7(D), whether the change prejudiced the defendant. Id. at 126. After reviewing the record, the court found no prejudice. The court first noted that the defendant could have moved for discharge of the jury under Crim. R. 7(D), but failed to do so. Id. The court also found that a motion for discharge would have been overruled in any event, because the defendant failed to show that he was prejudiced or misled by the amendment.
 {¶ 82} Because amendment is allowed under Crim. R. 7(D) in the court's discretion, our review is for abuse of discretion. State v.Brumback (1996), 109 Ohio App.3d 65, 81, and State v. Lewis (1993),85 Ohio App.3d 29, 32-33. In addition, a defendant must show prejudice as a result of the amendment. 109 Ohio App.3d at 81.
 {¶ 83} After reviewing the record, we find no abuse of discretion. To the contrary, the trial court acted reasonably in allowing the amendment. The court had already prepared an instruction on negligent assault before the State asked to amend the bill of particulars. The statute for negligent assault provides that "[n]o person shall negligently, by means of a deadly weapon or dangerous ordnance as defined in section 2923.11 of the Revised Code, cause physical harm to another or to another's unborn." R.C. 2903.14(A).
 {¶ 84} In comparison, the statute for assault provides that "[n]o person shall recklessly cause serious physical harm to another or to another's unborn." R.C. 2903.14(B). Although negligent assault is a third degree misdemeanor and assault is a first degree misdemeanor, the degree of the particular misdemeanor is irrelevant for purposes of a conviction for misdemeanor involuntary manslaughter. See R.C. 2903.04(B) (referring to "the offender's committing or attempting to commit a misdemeanor of any degree").
 {¶ 85} As a further matter, Davis was already charged in Count II with violating R.C. 2903.02(B). The bill of particulars for Count II stated that "[i]n addition to the information contained in Count II of the indictment the defendant knowingly caused Randall D. Powers serious physical harm or caused or attempted to cause Powers physical harm by use of a deadly weapon." Thus, Davis knew before trial and before amendment that the State would attempt to prove that he caused Powers serious physical harm. Notably, this element is the only difference between negligent assault and assault.
 {¶ 86} Under the circumstances, we fail to see how the amendment to the bill of particulars prejudiced Davis, even if the amendment is considered to be substantive. Accordingly, we reject the claim that Davis was convicted on evidence that was different from the evidence presented to the grand jury. We also note that Davis failed to move for discharge of the jury. In similar circumstances, the court in O'Brien found no prejudice. 30 Ohio St.3d at 126.
 {¶ 87} The fourth assignment of error is without merit and is overruled.
 V {¶ 88} In the fifth assignment of error, Davis contends he was denied a fair trial by the State's repeated attempts to introduce evidence of other acts of his bad character through improper questions, objections to which were only occasionally sustained. The evidence in question concerned Davis' alleged dealing in drugs and stolen goods; his alcoholism; and his failure to either work or pay child support for his children.
 {¶ 89} In responding to this assignment of error, the State says that evidence of illegal activities was relevant to the issue of motive. Specifically, the State's theory was that the relationship of the two men was intertwined with drugs, i.e., Powers allowed Davis certain favors like the use of his garage in exchange for drugs. In addition, Powers owed Davis money. Allegedly, the two men argued about these matters the night of the shooting. The State says the rest of the evidence was proper to rebut the claim that Davis was concerned for his children's safety.
 {¶ 90} Under Evid. R. 404(B):
 {¶ 91} "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 92} "Other acts" evidence is allowed where:
 {¶ 93} "(1) substantial proof is adduced to show that the person against whom the evidence is offered committed the other act, (2) one of the matters enumerated in the rule or the statute is a material issue at trial, and (3) the evidence tends to prove the material enumerated matter." State v. Penland (1998), 132 Ohio App.3d 176, 189.
 {¶ 94} In the present case, Davis does not argue that admitting each individual item of evidence was prejudicial error. Instead, he contends that the State's cumulative conduct deprived him of a fair trial. As a result, we interpret the assignment of error as one based on prosecutorial misconduct, which allows judgments to be reversed "only where the improper conduct deprived the defendant of a fair trial." Statev. Urbin, 148 Ohio App.3d 293, 309, 2002-Ohio-3401, ¶ 71. "The test for prosecutorial misconduct is whether the remarks made were improper and, if so, whether the rights of the accused were materially prejudiced." Smith v. State, 97 Ohio St.3d 367, 376, 2002-Ohio-6659. In this regard, the key issue is the fairness of the trial, not the prosecutor's moral culpability. State v. Hill (1996), 75 Ohio St.3d 195,203.
 {¶ 95} After reviewing the record, we cannot agree that the trial court deprived Davis of a fair trial by admitting the challenged evidence. Evidence that Davis furnished drugs to Powers during their relationship, and had stored stolen cars in Powers's garage, was pertinent to motive for the crime and was also relevant to show the absence of an accident. Powers' sons testified that they had seen Davis giving or selling drugs to their father. They also testified that Powers had let Davis store stolen cars in their garage. One son testified that Powers and Davis argued the night of the shooting about storing a car in the garage. The implication of this testimony was that Powers did favors for Davis in exchange for drugs.
 {¶ 96} Admittedly, the drug transaction and stolen car storage that the children witnessed took place some time before the shooting. Nonetheless, the evidence was relevant because the relationship continued in a similar pattern. Specifically, Powers still had a drug and alcohol problem, and Davis continued to request favors from Powers regarding autos that were allegedly stolen. In addition, both sons testified that they were familiar with how their father looked while using drugs, and that he had not used drugs before he left home on the night of the shooting. The autopsy indicated, however, that Powers had cocaine metabolites in his body. Although the coroner could not tell how soon before death Powers had taken cocaine, the jury was entitled to consider the evidence as bearing on motive or absence of accident. How much weight the evidence warranted was up to the jury.
 {¶ 97} In challenging the introduction of this evidence, the defense contends that the State failed to introduce evidence of an argument. However, that is incorrect. One of Powers' sons (Justin) testified about an argument the night of the shooting. In addition, the State presented testimony from Bobbi Jo Sapp (Justin's mother), who overheard Powers and Davis argue over money a week before the shooting. Sapp was not allowed to testify about this, after being examined outside the jury's presence. Nonetheless, Sapp did testify that she told Powers not to let Davis use his garage, which is consistent with an argument having ensued between the two men over the use of the garage. Kelly Servert (Powers' fiancee), also testified that she had warned Powers not to let Davis use the garage. Again, in view of these facts, we conclude that the challenged evidence was relevant.
 {¶ 98} The second area of disputed evidence involves questions the State asked Jessica Payne, who lived with Davis at the time of the shooting. Payne testified that Davis and Powers were friends, and drank together. The State then asked two questions to which objections were sustained: (1) whether Davis was an alcoholic; and (2) whether Davis lost his job at Target shortly before the shooting. Davis' objections were properly sustained, as these matters were irrelevant. Evidence of drinking or intoxication at the time of the shooting was pertinent — the bill of particulars alleged that Davis was under the influence of alcohol. However, the fact that an individual may be an alcoholic does not mean that he or she is under the influence of alcohol on a specific occasion. Davis' employment record was also not at issue, since it did not tend to prove any fact that was relevant — at least at the point the evidence was offered. On the other hand, since Davis did not ask for any curative instructions after his objections were sustained, any error related to these questions has been waived. State v. Davie,80 Ohio St.3d 311, 322, 1997-Ohio-341.
 {¶ 99} After the State rested, Davis put on evidence to support his claim that the shooting was accidental. Davis believed his family was in danger from people seeking revenge for an earlier shooting incident. Testimony during direct examination of defense witnesses indicated that the object of the revenge was Lonnie Dozier, who was in prison for drug trafficking, among other things, at the time the "revenge" was being sought. In addition to being a long-term friend of Davis, Dozier was also Powers' "drinking partner."
 {¶ 100} On direct examination, Davis testified about the threats to his family's safety, about his relationship with Dozier and Powers, and about events that took place before the shooting. During cross-examination, the State asked Davis a number of things, including whether Davis: (1) had a problem with alcohol; (2) had been to alcohol or drug rehabilitation; (3) had trouble holding a job; (4) had a "ferocious temper"; (5) was supported by his girlfriend, Jessica; (6) paid child support; and (7) was Powers' source for cocaine. The defense objected to all these questions, but only the objection to the child support question was sustained.
 {¶ 101} According to the State, most of the questions were appropriate as bearing on the credibility of Davis' professed concern for his family. The State further claims that even if questions about alcoholism were improper, they did not deprive Davis of a fair trial.
 {¶ 102} Under Ohio law, cross-examination is allowed on "all relevant matters and matters affecting credibility." State v. Treesh,90 Ohio St.3d 460, 480, 2001-Ohio-4.
 {¶ 103} Cross-examination is also "available for all matters pertinent to the case that the party calling the witness would have been entitled or required to raise." Id. at 481.
 {¶ 104} After reviewing the record, we conclude that questions about Davis' work history and the fact that he was supported by his girlfriend were relevant to rebut his claim that he was concerned over his family's welfare and safety. Likewise, the question about child support, although not allowed, could have been relevant to the jury's assessment of the credibility of this claim. See Smith, 97 Ohio St.3d 367,376-77.
 {¶ 105} Questions about alcohol problems and rehabilitation were not relevant, for the reasons mentioned earlier. In addition, questions about Davis' "ferocious" temper, and about the fact that Davis' former girlfriend and mother of some of his children did not want him to know her location, were inappropriate, since the record did not contain any evidence about these points. The judge did sustain an objection to the question about Davis' former girlfriend, but defense counsel did not ask for a curative instruction.
 {¶ 106} Evidence of Davis' temper problems or violent tendencies could have been relevant, since the State was attempting to prove that Davis shot Powers as the result of a disagreement. However, after asking the above questions, and implying that supporting evidence existed, the State made no attempt during rebuttal to present such evidence. "During a trial, an attorney may not present information that is not in evidence to a jury under the pretext of asking questions. * * * [A]t the trial level it is highly improper for a lawyer to refer in colloquy, argument, or other context to factual matter beyond the scope of the evidence or the range of judicial notice." City of Sidney v. Walters (1997),118 Ohio App.3d 825, 829.
 {¶ 107} In analyzing if a defendant has been deprived of a fair trial, we decide "whether, absent the improper questions or remarks, the jury would have found the * * * [defendant] guilty." State v. Willard
(2001), 144 Ohio App.3d 767, 773. After considering the record, we conclude that a jury would have found Davis guilty without the improper remarks. In the first place, the remarks were not egregious and were isolated instances in a trial that lasted several days. Moreover, the fact that the jury acquitted Davis of two counts of murder indicates that it was able to distinguish between degrees of culpability, and did not attach undue weight to evidence of Davis' "bad character."
 {¶ 108} As an additional point, we note that the properly admitted evidence indicates that Davis gave inconsistent stories to the police after the incident. The physical evidence was also at odds with his story of a purely accidental shooting.
 {¶ 109} For example, Davis told the dispatcher during the 911 call that the shooting was an accident. In contrast, he told the police shortly after the shooting that someone had tried to rob him — implying that another person shot Powers and that it was not accidental. Davis also said, when his hands were swabbed for gunpowder residue, that he and others had been shooting guns all day. However, no evidence supported this claim. Instead, the evidence is clear that Davis had been at a birthday party for his daughter before the shooting, and that Powers did not bring the assault rifle over until late that night.
 {¶ 110} Davis also made other comments to the police implying that he was not the shooter, and that Powers was shot by others who came in the front door of the house. In fact, Davis told the police that Powers was shot while trying to protect him (Davis). In contrast, gunpowder residue tests showed that Davis had discharged a weapon, handled a weapon, or was in close proximity to a weapon during discharge. Later, at trial, Davis admitted shooting Powers, but said the shooting was accidental. This claim, however, was belied by expert testimony on gunpowder residue and blood spatters. Specifically, this evidence was inconsistent with statements Davis made about the position of Powers' hands at the time of the shooting. In view of these facts, we conclude that the jury would have convicted Davis of involuntary manslaughter even in the absence of any improper remarks.
 {¶ 111} Accordingly, the fifth assignment of error is without merit and is overruled.
 V {¶ 112} In the sixth assignment of error, Davis contends that his conviction on Count VIII is not supported by sufficient evidence. Due to our resolution of the second assignment of error, this assignment of error is moot and will not be considered.
 VI {¶ 113} In the seventh and final assignment of error, Davis claims that the trial court erred and abused its discretion in sentencing him to maximum, consecutive sentences. Davis concedes that the trial court made the required statutory findings to support maximum consecutive sentences, but contends that the record does not support the court's findings. In this regard, Davis focuses on the fact that possessing weapons under disability is a fifth degree felony and a strict liability offense. According to Davis, when the underlying felony is a strict liability offense and is the least serious class of felony, it cannot, by definition, be the "worst form of the offense." Davis also points out that his only prior criminal conviction was at age 19, for assault on a police officer, and that his conviction for tampering with evidence was based on a spur of the moment decision. Concerning the latter point, Davis notes that since he voluntarily called the police to the scene before hiding the gun, his decision was obviously not an attempt to cover up evidence. And finally, Davis claims that he did not have an adequate chance to create a record in the trial court because the judge did not order a pre-sentence investigation and held the sentencing hearing just twelve hours after the conviction.
 {¶ 114} In response, the State argues that appellate courts have no ability to review maximum sentences when the trial court complies with statutory requirements. The State also believes that consecutive sentences are warranted by the circumstances of the crime, Davis' prior record, and Davis' attempt to frustrate the police investigation.
 {¶ 115} As an initial point, we note that Davis has waived any error, except plain error, about the lack of opportunity to create a record, since he failed to raise procedural deficiencies with the trial court. State v. Green, 90 Ohio St.3d 352, 371, 2000-Ohio-182. Furthermore, there was no procedural error, since pre-sentence investigations are not required for all sentencing proceedings. Specifically, courts do not have to order pre-sentence investigations in felony cases unless probation is being considered. State v. Garrison
(1997), 123 Ohio App.3d 11, 16.
 {¶ 116} As an additional matter, the defense had a chance to offer any evidence it wished. If Davis needed more time, he could have asked the court to postpone the hearing. However, he did not attempt to do so, and does not suggest on appeal what other evidence he would have offered. Under the circumstances, we find no procedural error.
 {¶ 117} We do disagree with the State about our duty and power to review maximum sentences. The State's argument is based on the fact that maximum sentences are not specifically mentioned in R.C. 2953.08(G)(2)(a). This part of the statute provides that:
 {¶ 118} "[t]he court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
 {¶ 119} "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
 {¶ 120} "(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (E)(4) of section 2929.14, or division (H) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
 {¶ 121} "(b) That the sentence is otherwise contrary to law."
 {¶ 122} The code sections specifically mentioned in R.C.2953.08(G)(2)(a) relate to: (1) findings used to decide if prison terms or community control are warranted for certain classes of offenders; (2) findings required for imposing consecutive sentences; and (3) findings required in connection with judicial release of certain offenders. Since the findings required for maximum sentences under R.C. 2929.14(C) and R.C. 2929.19(B)(2)(d) and (e) are not included in this group, the State argues that appellate courts do not have the power to decide if a trial court's findings for maximum sentences are supported by the record.
 {¶ 123} We disagree with the State on this point, as it would render the statutory framework pointless. In State v. Edmonson,86 Ohio St.3d 324, 1999-Ohio-110, the Ohio Supreme Court held that courts must give findings and reasons for the findings when sentencing offenders to maximum terms. Id. at 329. "Findings are the specific criteria enumerated in R.C. 2929.14(C), which are necessary to justify maximum sentences; reasons are the trial court's bases for its findings which evince the trial court's adherence to the General Assembly's policies of establishing consistency in sentencing and curtailing maximum sentences."State v. Anderson, 146 Ohio App.3d 427, 437-38, 2001-Ohio-4297. If the reasons for a finding are not subject to appellate review, there is no point in requiring trial courts to give reasons.
 {¶ 124} Furthermore, courts do, in fact, examine the record to see maximum sentences are supported. See, e.g., State v. Johnson, Champaign App. No. 2002 CA 3, 2003-Ohio-908, ¶ 9 (finding that facts in record supported trial court's finding that defendant posed greatest likelihood of committing future crimes and should, therefore, receive maximum sentence); State v. Kershaw (1999), 132 Ohio App.3d 243, 246, and Statev. Aquirre (June 14, 2000), Lorain App. No. 99 CA 007434, 2000 WL 763343, *3 (referring to record to see if trial court's findings on maximum sentence were supported). Accordingly, we reject the State's claim that we have no power to review the record in connection with maximum sentences.
 {¶ 125} Under R.C. 2929.14(C), courts may impose a maximum sentence for a felony:
 {¶ 126} "only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders under division (D)(3) of this section, and upon certain repeat violent offenders in accordance with division (D)(2) of this section."
 {¶ 127} At the sentencing hearing, the trial court made the following findings: (1) that the victim suffered serious physical harm of the highest degree; (2) that there was a relationship involving drugs and alcohol; (3) that Davis had a history of criminal convictions, in that he had been convicted previously of assault on a police officer, which was a felony of violence; (4) that Davis had not responded favorably to sanctions previously imposed; (5) that a pattern of drugs and alcohol appeared to be involved in the relationship between the two parties; and (6) that Davis showed some remorse at the sentencing hearing. Regarding the felony conviction on Count III, the court said that it had recited factors indicating this was the worst form of the offense. Accordingly, the court sentenced Davis to the maximum term of five years.
 {¶ 128} Regarding the conviction for tampering with evidence, the court commented that Davis had committed the worst form of the offense because a weapon is a key, if not the key, piece of evidence in a homicide case. In this regard, the court stressed that if the gun had not been discovered, Davis may well have escaped prosecution. As a result, the court imposed a five-year, maximum sentence also for tampering with evidence.
 {¶ 129} Later in the hearing, the court additionally commented that Davis had a "great likelihood of committing future crimes by the life-style indicated and the surrounding circumstances of the offense and the evidence presented at trial." Thus, the court made two findings under R.C. 2929.14(C), even though only one was required.
 {¶ 130} The court's reasons concerning the sentence for tampering with evidence are connected to the statutory finding and are supported by the record. Likewise, the record supports the finding that Davis had the greatest likelihood of committing future crime. Although Davis' most serious former charge was the 1996 felony conviction for assaulting a police officer, the record also reveals that Davis was arrested on numerous prior occasions for charges like drug abuse, driving under the influence of alcohol, and driving under suspension. In fact, he was arrested for the latter charge several times. At the time of the shooting, additional warrants were pending for Davis' arrest on charges of speeding, failure to appear, and driving under suspension.
 {¶ 131} The fact that Davis had a prior felony conviction and also continued to drive under suspension, even after repeated arrests, indicates that he is extremely likely to commit future crimes. Accordingly, we agree with the trial court that maximum sentences are appropriate. Because this statutory ground is sufficient, it was not necessary for the trial court also to find that Davis committed the "worst" forms of involuntary manslaughter and tampering with evidence.
 {¶ 132} We do note, for future guidance, that if the court intends to make a finding that a particular crime is the worst form of an offense, it should directly connect the finding with the supporting reasons. See State v. Peck, Champaign App. No. 2002-CA-24,2003-Ohio-3836, ¶¶ 14-19. In the present case, of the reasons given by the court, only two fit within R.C. 2929.12(B) as indicating the crime was more serious than conduct normally constituting the offense. These are: (1) that "[t]he victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense;" and (2) that "[t]he offender's relationship with the victim facilitated the offense."
 {¶ 133} The first factor cannot apply, since every involuntary manslaughter victim suffers serious — indeed, the ultimate — physical harm. This leaves only the factor that the offense was facilitated by the offender's relationship with the victim. In some circumstances, one factor alone may cause a particular crime to be the worst form of the offense — although it does not appear to be sufficient here. Specifically, we are not convinced that a maximum sentence would be warranted simply because the parties' relationship involved drugs and alcohol.
 {¶ 134} In this regard, we note that other courts have struggled with how to apply the factor of whether a crime is the worst form of an offense. See Kershaw, 132 Ohio App.3d 243, 247 (finding that the concept of the "worst" form of an offense is nebulous), and State v. DeAmiches
(March 1, 2001), Cuyahoga App. No. 77609, 2001 WL 210020, *7-9 (noting that "[i]f courts do not apply some standard to the abstract `worst form' analysis, the statute will provide no guidance and thus serve no purpose"). We agree that the term is somewhat nebulous. However, since maximum sentences are supported in this case by another factor, we need not consider further whether Davis committed the worst form of the offenses.
 {¶ 135} The final issue is whether consecutive sentences are warranted by the record. R.C. 2929.14(E)(4) permits consecutive sentences:
 {¶ 136} "if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 137} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 138} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 139} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 140} The trial court's stated reasons for imposing a consecutive sentence for the conviction for tampering with evidence are that the crimes were committed with a separate animus, and that the sentence would deter other similarly situated criminals faced with an opportunity to conceal or hide evidence. In addition, the court repeated the approximate language contained in R.C. 2929.14(E)(4)(b) and (c). However, the court did not connect specific reasons to these statutory findings.
 {¶ 141} When trial courts impose consecutive sentences, they cannot simply recite the statutory language of R.C. 2929.14(E)(4)(a), (b), or (c). Instead, they must give sufficient reasons to support the statutory findings, as required by R.C. 2929.19(B)(2)(c). Anderson,146 Ohio App.3d 427, 2001-Ohio-4297, at ¶ 71.
 {¶ 142} While the trial court's comment about deterring other offenders is apt, it is, in fact, irrelevant to the question of whether this particular defendant should receive a consecutive sentence. Consecutive sentences will always provide the greatest deterrence to others similarly situated in the future, so this consideration does not differentiate between classes of offenders.
 {¶ 143} The presence of a separate animus for the crimes may satisfy the first part of R.C. 2929.14(E)(4)(b), but it does not explain why the trial court felt that "the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct."
 {¶ 144} We have stressed on numerous occasions that appellate courts should not have to guess what the reasons for a particular sentence are. See, e.g., State v. Turner, Montgomery App. No. 19525,2003-Ohio-3828, ¶ 13, quoting State v. Rothgeb, Champaign App. No. 02CA9, 2003-Ohio-465. As the First District Court of Appeals noted inAnderson, "[a]bsent well-articulated reasons, it is difficult to discern whether the trial court heeded the General Assembly's policy curtailing consecutive sentences." 2001-Ohio-4297, at ¶ 71.
 {¶ 145} Because the trial court failed to provide reasons for its findings, the seventh assignment of error is sustained in part, but only regarding the consecutive sentence imposed for Count IV. The remainder of the assignment of error is without merit and is overruled. Accordingly, that part of the trial court judgment making the sentences consecutive is reversed, and this case will be remanded for re-sentencing in accordance with law.
 VII {¶ 146} The first, fourth, and fifth assignments of error having been overruled; the second assignment of error having been sustained; the third and sixth assignments of error having been overruled as moot; and the seventh assignment of error having been sustained in part, and overruled in part, Davis's conviction and sentence on Count VIII is reversed and vacated, that part of the judgment of the trial court making the sentence imposed for Count IV consecutive with other sentences is reversed and vacated, the judgment of the trial court is affirmed in all other respects, and this cause is remanded to the trial court for re-sentencing.
BROGAN and WOLFF, JJ., concur.