[Cite as *State v. Matthews*, 2015-Ohio-3614.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No. L-14-1134

    Appellee                                   Trial Court No. CR0201301070

v.

Xzavier Matthews                            **DECISION AND JUDGMENT**

    Appellant                                  Decided:  August 31, 2015

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Joseph J. Urenovitch, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Xzavier Matthews, appeals from the May 30, 2014 judgment of

the Lucas County Court of Common Pleas sentencing him following his conviction of

burglary, aggravated burglary with a firearm specification, felonious assault with a

firearm specification, aggravated robbery with a firearm specification, and grand theft of

a motor vehicle.  For the reasons which follow, we affirm.

ASSIGNMENT OF ERROR NUMBER 1

THE TRIAL COURT ABUSED ITS DISCRETION DENYING DEFENDANT'S MOTION FOR SEPARATE TRIALS, CAUSING PREJUDICE TO DEFENDANT.

ASSIGNMENT OF ERROR NUMBER 2

DEFENDANT'S CONVICTION FOR BURGLARY, COUNT ONE OF THE INDICTMENT, WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

ASSIGNMENT OF ERROR NUMBER 3

DEFENDANT'S CONVICTION FOR AGGRAVATED BURGLARY, FELONIOUS ASSAULT, AGGRAVATED ROBBERY, AND GRAND THEFT OF A MOTOR VEHICLE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 2} This case involves two incidents that occurred on August 8 and 28, 2011. On August 8, 2011, appellant is alleged to have attempted to enter a home while the residents were away. On August 28, 2011, appellant is alleged to have entered an occupied home and, when confronted, threatened the victims with a gun, assaulted and shot one of the victims, and left the premises with the couple's television and car.

{¶ 3} Appellant was indicted in two separate indictments, which were joined for trial. Appellant was charged with committing six offenses: (1) burglary, a violation of R.C. 2911.12(A)(2) and (D); (2) aggravated burglary, a violation of R.C. 2911.11(A)(1);

2.

(3) felonious assault, a violation of R.C. 2903.11(A)(2), with a firearm specification (R.C. 2941.145); (4) attempted murder, a violation of R.C. 2923.02, with a firearm specification (R.C. 2941.145); (5) aggravated robbery, a violation of R.C. 2911.01(A)(1), with a firearm specification (R.C. 2941.145); and (6) grand theft of a motor vehicle, a violation of R.C. 2913.02(A)(1) and (B)(5). Appellant moved for relief from prejudicial joinder pursuant to Crim.R. 14, arguing that the counts rising from two separate incidences should not have been joined. The trial court denied the motion. Appellant renewed his motion at trial, and, again, the trial court denied the motion.

{¶ 4} We address appellant's second and third assignments of error first. In his second assignment of error, appellant argues that his conviction for burglarizing the Ducat home was not supported by sufficient evidence.

{¶ 5} A challenge to the sufficiency of the evidence is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The standard for determining whether there is sufficient evidence to support a conviction is whether the evidence admitted at trial, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, citing *Jackson v. Virginia*, 443 U.S.

3.

307, 319, 99 S.Ct. 2781, 61 L.E.2d 560 (1979). *Accord Thompkins*. Therefore, "[t]he verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997), quoting *Jenks* at 273. In determining whether the evidence is sufficient to support the conviction, the appellate court does not weigh the evidence nor assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978), and *State v. Willard*, 144 Ohio App.3d 767, 777-778, 761 N.E.2d 688 (10th Dist.2001). But, the court must view the evidence in the light most favorable to the prosecution. *Jenks, supra*. If the state "relies on circumstantial evidence to prove an element of the offense charged, there is no requirement that the evidence must be irreconcilable with any reasonable theory of innocence in order to support a conviction" so long as the jury is properly instructed as to the burden of proof, i.e., beyond a reasonable doubt. *Jenks* at paragraph one of the syllabus.

{¶ 6} To establish burglary pursuant to R.C. 2911.12(A)(2), the state was required to prove that appellant:

> by force, stealth, or deception, trespass[ed] in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense.

4.

{¶ 7} The following evidence was admitted at trial. Douglas Ducat testified he and his wife were returning home at 8:00 a.m. after running an errand. His home is located at the end of a dead-end street. All of the doors to his home were locked except for a three-season porch, from which there is access to the home through a wooden sliding door. When Ducat arrived home and turned into his driveway, he saw a gray minivan parked in the driveway and a man standing behind the minivan near the rear of his house putting something into the garbage cans. Appellant admitted being the man who was at the Ducats' home.

{¶ 8} Ducat's wife exited the car first and confronted appellant. Mr. Ducat followed and confronted appellant in the backyard. Appellant responded that he was looking for someone to repair his car. Mr. Ducat did not recognize the name appellant supplied and did not know anyone who repaired cars. The conversation lasted about ten minutes as Mr. Ducat and appellant walked toward the front of the house. Mr. Ducat became suspicious of appellant when he started acting nervous, so Mr. Ducat asked appellant to empty his pockets. As appellant began to comply, however, Mr. Ducat told appellant to stop and pointed him to a neighbor who was working on a boat. As Mr. Ducat was moving his car into the driveway, he saw appellant at the neighbor's house knocking on their front door.

{¶ 9} After appellant had left, Mr. Ducat examined the back porch area and found that the door had gouge marks on the top and bottom side of the lock. Mr. Ducat had not seen the gouge marks before. Mr. Ducat did not believe that he could have missed seeing

5.

the marks previously because he passes through the door on a regular basis and the height of the door causes the lock to fall at eye level. Mr. Ducat also found that keys left on the porch were missing. Mr. Ducat checked the garbage cans and found a bag in which the man had defecated and placed one of their beach towels. Mr. Ducat had used the garbage can the night before and knew this bag had not been there.

{¶ 10} Detective Singlar, the lead investigator, testified he spoke with the Ducats and they described the man who was at their home as being tall, approximately six foot, and skinny, and an African-American. The man also had a gold decoration on his teeth and a full sleeve tattoo on one arm. The man was not wearing glasses. The detective observed the pry marks on the Ducat's door. He did not observe any other damage or deterioration on the home. The Bureau of Investigation refused to test the fecal matter. The department was able to obtain latent fingerprints, but nothing sufficient was revealed from the national fingerprint database. A few weeks later, the detective was able to develop a possible suspect, based upon information from another detective, and prepared a photo array. The detective could not remember how the other detective came up with appellant's name. Mr. Ducat was able to identify appellant from the photo array and he identified appellant again at trial as the man who tried to burglarize his home.

{¶ 11} Appellant denied having attempted to break into the Ducat home. He had not noticed any damage to the exterior of the home. He testified he was directed by someone at a neighboring McDonald's to Mr. Ducat to hire him to do bodywork on appellant's car. When Mr. Ducat arrived home, appellant and Mr. Ducat talked about the

6.

car as they headed toward appellant's car. Mr. Ducat suggested a neighbor who could do bodywork. After appellant had started his car, Mrs. Ducat came up to the car yelling and asked appellant to empty his pockets. Appellant drove to the neighbor's home, but no one was home.

{¶ 12} Appellant challenges that there was no direct evidence of criminal intent. However, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus, 574 N.E.2d 492. In this case, we find that there was sufficient circumstantial evidence to support the conviction. Appellant admitted he was the man the Ducats found at their home. Mr. Ducat testified that there were gouge marks on the lock area of the door which were not there earlier. The investigating detective confirmed the presence of the marks, but could not testify as to when they were made. Items were moved on the porch and their keys were missing. Appellant was seen throwing something into the garbage and Mr. Ducat found a bag that he had not seen in the garbage the night before. The home was located at the end of a dead-end street. Appellant gave a vague answer why he was at a private home. Appellant acted nervous. This evidence alone was sufficient for a trier of fact to conclude that appellant had entered the porch by stealth and had attempted to enter the interior of the home by force. Therefore, appellant's second assignment of error is not well-taken.

{¶ 13} In his third assignment of error, appellant argues that his conviction of aggravated burglary, felonious assault, aggravated robbery, and grand theft of a motor

7.

vehicle arising out of the incident involving the Gacsals was contrary to the manifest weight of the evidence.

{¶ 14} Even when there is sufficient evidence to support the verdict, a court of appeals may decide that the verdict is against the weight of the evidence. *Thompkins*, 78 Ohio St.3d at paragraph two of the syllabus, 678 N.E.2d 541. When weighing the evidence, the court of appeals must consider whether the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn from it, consider the weight of the evidence, and consider the credibility of the witnesses to determine if "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 15} To obtain a conviction of aggravated burglary, felonious assault, aggravated robbery, and grand theft of a motor vehicle the prosecution was required to prove the following: (1) aggravated burglary—appellant did "by force, stealth, or deception, * * * trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, * * * and [t]he offender inflicts, or attempts or threatens to inflict physical harm on another"; (2) felonious assault—appellant "knowingly * * * [c]ause[ed] or attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance"; (3) attempted murder—appellant "purposely or knowingly * * * engage[d] in conduct that, if successful, would constitute" murder; (4) aggravated

8.

robbery—appellant "in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense * * * [had] a deadly weapon on or about [his] person or under [his] control and either display[ed] the weapon, brandish[ed] it, indicate[d] that [he] possess[ed] it, or use[d] it"; and (5) grand theft of a motor vehicle— appellant "with purpose to deprive the owner of property or services, * * * knowingly obtain[ed] or exert[ed] control over * * * [an automobile] * * * [w]ithout the consent of the owner or person authorized to give consent."

{¶ 16} The following evidence was presented regarding the second offense. Frank Gacsal, the victim, had a lengthy prior felony criminal background. He testified that he and his wife, Jacqueline, had moved into their home several days before August 28, 2011. The couple was watching TV that evening with the lights on in the living room. His wife got up and went into the hallway and Gacsal heard his wife talking to someone and asking who the person was. Gacsal flew off the couch and ran around the corner and crashed into a person causing the person to hit the wall and fall into a bedroom. The man landed on the bed and was hitting Gacsal with his left hand while Gacsal was hitting the man with his right hand. Gacsal wondered why the man was not using his right hand, so Gacsal switched hands and reached down the man's right arm to find he was holding a pistol. The pistol fired and a bullet struck Gacsal in the corner of his right eye and passed through his left cheek and lodged into his arm. Gacsal jumped over the bed and landed on his hands and knees. He could not see anything because of the blood and because the

9.

bedroom was dark.  He could not remember anything after that point, except seeing the man stealing their car.  Gacsal could not give a description of the man.

{¶ 17} Jacqueline Gacsal testified that when she went to the unlit hallway of her home that night, she encountered a man, wearing a black hoodie sweatshirt with the hood up, a white scarf around his head with the eyes cut out, black pants, and red tennis shoes. He was not wearing glasses.  She also saw that he was carrying a silver gun, which he pointed at her.  While the light in the hallway was off, the light from the living room gave her a clear view of the man.  When she screamed and asked what he was doing there, her husband came running, and he ran into the man.  The two men fell into the bedroom and onto the bed.  She followed them into the room, heard two gunshots, and saw a flash of light.  She turned on the lights and saw blood and her husband's face bleeding.  The intruder lay on the bed.  His mask and hoodie had fallen off and she could clearly see his face.  The intruder told her to get the car keys while he pointed the gun at her.  He followed her and stood about two feet away in the lighted living room while she faced him and could again clearly see his face.  When he left through the front door with the keys, she returned to the bedroom to check on her husband and started to call 911.  The intruder returned to the bedroom, still without his hoodie or mask, and pointed the gun at her again and asked her who she had called.  He took her cell phone just as the 911 operator answered and put it in his pocket.  Again, she faced him as he handed her the car keys and demanded that she tell him which key to use for the car.  He directed her out of the bedroom and told her to unhook the TV and Blu-ray player and carry them to the car.

10.

It took her some time to disconnect the TV and the intruder walked back to the bedroom while she worked. He directed her to load up the car while he got inside the car. As soon as she saw his hands on the steering wheel, she ran around the side of the house. Her husband was coming out of the house as the intruder drove away. She ran to the neighbor's house to use the phone.

{¶ 18} She described the intruder to one of the first police officers on the scene, telling him that she had seen his face when his mask came off. She testified that she described the intruder as a black man who was wearing a black sweatshirt. He did not have glasses. She could not recall describing the tonal color of his skin until after Detective Cooper inquired. She could not recall having talked to the police officers who transported her downtown or any other officer.

{¶ 19} When she arrived at the police station, she spoke with Detective Cooper. He was trying to calm her down because she was still in shock from the incident. Detective Cooper inquired about the intruder's skin color tone and she replied that the intruder's skin color was the same as the detective. He also asked about the intruder's height and she thought he was taller than Detective Cooper. She could not recall giving an exact height. She could not recall tattoos or any other distinguishing features.

{¶ 20} On September 1, 2014, she called the police to ask for a sketch artist to draw the intruder because she could remember what he looked like. A detective brought her a photo array at the hospital entrance where her husband was recuperating. She was able to identify appellant as the intruder from both the photo array and again in person at

11.

trial. Sometime after she learned appellant's name but still within ten days after the incident, while her husband was still in the hospital, she checked appellant's posts on a social network and noticed he was wearing the same red shoes she remembered from the night of the attack. She later mentioned that fact to the detective.

{¶ 21} Detective Cooper, the lead investigator, testified that he arrived at the Gacsal home after Frank Gacsal had been taken to the hospital. The point of entry into the home was determined to have been through a window in the main bedroom. No fingerprints were obtained. It was clear that a struggle had occurred in the bedroom and two shots had been fired. He recalled that Mrs. Gacsal was very upset at the time, but she was calmer by the time he interviewed her at the station. She described the intruder as a 20- to 24-year-old black man about the height of the detective or a little taller (the detective is six feet tall), with hair pulled back in a bun, like an Afro puff. The detective did not recall or report Mrs. Gacsal as describing the intruder as a dark-skinned man, but other reports indicated that she had given other officers this description. The other reports also did not include a description of the intruder's hair. In the photo of appellant that was used, he did not appear to have dark-toned skin or an Afro puff. Detective Cooper testified he would not classify appellant as a dark-skinned man.

{¶ 22} On September 1, the detective had a photo array shown to Mrs. Gacsal. The detective obtained the photographs for the array by submitting the description of the intruder into a national database. The detective also discussed the case with other

12.

detectives and appellant's name was mentioned. Therefore, appellant's mug shot was added to the photo array. He observed Mrs. Gacsal identify appellant right away.

{¶ 23} The detective also learned that a neighbor had observed an African-American man walking up and down the street 20 minutes prior to the intrusion. The man was described as being 250 pounds and six feet tall. The man met up with some other people and then left. The neighbor did not see the other men closely enough to identify them.

{¶ 24} The detective believed that Jacqueline Gacsal may have obtained appellant's name from the warrant for his arrest. The detective leader learned that Jacqueline Gacsal had looked appellant up on a social network.

{¶ 25} Detective Quinn testified that he showed the photo array prepared by Detective Cooper to Jacqueline Gacsal. She immediately identified defendant as the intruder without any hesitation or further inquiry.

{¶ 26} Officer Trudeau testified when he arrived at the scene, there were a few officers there already and he approached Mrs. Gacsal to identify her while the other officers attended to the injured victim. Mrs. Gacsal was hysterical and was crying and screaming. He tried to calm her down. Detective Cooper asked the officer to transport Mrs. Gacsal downtown. The officer could not remember if she made statements about the incident at the scene or while he was transporting her, but he recorded her statements. He reported that Mrs. Gacsal described the assailant was an 18- to 20-year-old, dark-skinned black male, wearing a black hoodie sweatshirt and black baggy pants, and he was

13.

carrying a silver revolver. She also said that the man looked like he had a mask made of a severed white T-shirt sleeve stretched over his head with holes cut out for his eyes. She did not mention that the mask came off during the encounter. Mrs. Gacsal also stated that her dog never barked until after she had seen the man.

{¶ 27} Appellant testified that he is currently 22 years old, six-feet or six-feet one-inch tall, and weighs 190 pounds. He described himself as an African-American with light-colored skin. He was wearing glasses. At the time of trial, he was under the supervision of the North Coast Correctional Institution as a result of a prior 11-year sentence for the crimes of burglary, arson, and tampering with evidence, which occurred in Wood County. Prior to that sentence, appellant had been sentenced in Lucas County on two separate occasions for attempted burglary and receiving stolen property. Appellant testified that he did not commit the crime involving the Gacsals and had never been to that address or known the Gacsals.

{¶ 28} When all of the evidence is considered as a whole, we find that the judge, as the trier of fact, did not lose his way in evaluating the evidence and drawing inferences from the direct evidence. It is clear that the man who wrongfully entered the Gacsal home committed the charged offenses. The only issue raised by appellant is whether he was properly identified as the perpetrator. Mrs. Gacsal was the only witness able to identify the perpetrator, but she was fully able to view him and described his appearance to the police. She identified appellant as the perpetrator both through a photo array viewed a few days after the crime and again at trial. Appellant, however, denies being

14.

the perpetrator. Appellant challenges that Mrs. Gacsal's identification is flawed because she described the perpetrator to Officer Trudeau as a dark-skinned black man, but appellant does not have dark-toned skin. Furthermore, her identification of appellant as the perpetrator occurred after she had researched appellant on social media and attended several criminal hearings.

{¶ 29} The trial court found Mrs. Gacsal to be credible and appellant not credible. The court's conclusion is not unreasonable. Mrs. Gacsal testified that she never discussed the perpetrator's skin tone so the report could have been inaccurate. She did have a clear view of appellant and was able to identify him four days later in a photo array of various skin-toned black men. Mrs. Gacsal did not search appellant on the internet until after identifying him in the photo array. Her search only confirmed her identification because she recognized his shoes from a photograph on his site. While Mrs. Gacsal saw appellant at the preliminary hearings, they did not occur until nearly a year after she identified appellant from the photo array because appellant was not apprehended until almost a year after the incident. Therefore, we find that appellant's conviction was not contrary to the manifest weight of the evidence. Appellant's third assignment of error is found not well-taken.

{¶ 30} In his first assignment of error, appellant argues that the trial court abused its discretion when it denied his motion to sever the charges for trial.

{¶ 31} Under Crim.R. 14, a defendant may challenge the joinder of offenses for trial when the joinder results in prejudice to the defense. The burden of proving prejudice

15.

is on the defendant. *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus. The state may rebut a claim of prejudice by showing the state could introduce evidence of the joined offenses as other acts under Evid.R. 404(B), or that joinder of the trials is not prejudicial because the evidence of each crime is simple and direct, *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 50. If the state can establish that the evidence is simple and direct, it need not prove the evidence would be separately admissible. *State v. Johnson,* 88 Ohio St.3d 95, 109, 723 N.E.2d 1054 (2000) (citations omitted). The trial court's decision is reviewable under an abuse of discretion standard. *LaMar* at ¶ 49.

{¶ 32} Appellant first argues that the convictions occurred only because the cumulative effect of the evidence of both charges being presented in one trial. He contends the evidence to convict in each case was weak. We disagree. Upon a review of the evidence we find that there was simple and direct evidence presented that was sufficient to sustain each verdict as discussed *infra*. Because the evidence was simple and direct, the state was not required to show that it could have introduced evidence of the joined offenses as other acts under Evid.R. 404(B).

{¶ 33} Second, appellant asserted that joinder of the offenses affected his defense strategy and the exercise of his Fifth Amendment rights. This argument has been addressed by the Ohio Supreme Court and rejected. Even though a joint trial will compel the defendant to determine whether testifying as to one charge but not the other would result in the trier of fact drawing adverse inferences, this is not the type of coercion the

16.

Fifth Amendment prohibits. *State v. Roberts*, 62 Ohio St.2d 170, 175-76, 405 N.E.2d 247 (1980).

{¶ 34} Therefore, we find the trial court properly denied appellant's Crim.R. 14 motion and appellant's first assignment of error is not well-taken.

{¶ 35} Having found that the trial court did not commit error prejudicial to appellant, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                                                    _____

JUDGE

Arlene Singer, J.              

_____

Stephen A. Yarbrough, P.J.             JUDGE
CONCUR.

_____

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.